26180 Curtiss Wright Parkway
Cleveland, Ohio 44143
TEL  216-261-3500
FAX  216-750-8790



May 1, 2019


**Sklar Transport, LLC**
5395 Pearl Parkway, Suite 200
Boulder, CO  80301


Re:    Program Agreements for Lease of 9.375% Interest in Phenom 300


Dear Mr. Nenninger,

Attached are the documents for your review and acceptance. I look forward to assisting with this transaction.

If the documents reflect your understanding of the terms and you are ready to proceed, please sign where applicable. Date fields within the agreements will be completed upon receipt of the documentation and will reflect the closing date.  All executed documents may be returned to me via email below followed by originals using the included return label.

For closing, we will require a set of signed documents along with any funds due wired and confirmed.  Once received, we will close on the transaction and begin processing your account for immediate use.

Included in the attachments is an invoice with Flexjet's wire instructions.  Please remit by wire transfer the amount shown on the Lease Invoice.

Thank you and please let us know of any questions. Your sales representative, Adam Tibbitts, may be reached at (801) 831-4287 or by email at adam.tibbitts@flexjet.com or I may be reached at (216) 797-8119 or by email at cheri.davies@flexjet.com.

We look forward to the opportunity to serve your private travel needs.

Best Regards,


Cheri Davies
Flexjet Contracts Department

Attachments



# INVOICE
## Sklar Transport, LLC
May 1, 2019

| Lease | | |
|---|---|---|
| **9.375% Interest in Phenom 300; N360FX** | | |
| Security Deposit | $ | 45,000.00 |
| First Month's Fixed Lease Payment | $ | 9,282.00 |
| First Month's Monthly Management Fee | $ | 13,073.00 |
| Occupied Hourly Rate Deposit | $ | 19,181.00 |
| Ohio Sales and Use Tax | $ | 75.00 |
| **Subtotal** | **$** | **86,611.00** |

| **Total due to Flexjet at Commencement** | **$** | **86,611.00** |
|---|---|---|

---

**WIRE INSTRUCTIONS – FLEXJET, LLC**

| | |
|---|---|
| TO: | CIBC Bank USA |
| Bank Address: | 120 South LaSalle |
| | Chicago, IL 60603 |
| ABA # | ██████████ |
| BENEFICIARY: | Flexjet, LLC |
| **ACCOUNT #:** | ██████████ |
| **Reference:** | **Closing - Sklar Transport, LLC** |

DocuSign Envelope ID: 12337A7-305D-47A5-A55C-115D191DBF7F



## GENERAL TERMS AND CONDITIONS AGREEMENT

**THIS GENERAL TERMS AND CONDITIONS AGREEMENT** is between **FLEXJET, LLC**, a Delaware limited liability company ("**Flexjet**"), and **Sklar Transport, LLC**, 5395 Pearl Parkway, Suite 200, Boulder, CO 80301 ("**Owner**"). The following definitions, terms, and conditions are applicable generally to all of the Program Agreements (as defined below). To the extent that a provision set forth in this General Terms and Conditions Agreement is in conflict with any provision of a Program Agreement, the applicable provision of the Program Agreement shall control.

The parties therefore agree as follows:

1. **DEFINITIONS.**

"**Accident Suspension**" means the suspension of a pilot, the commercial pilot or airline transport pilot certificate of a flight crew member of Flexjet, or of any FAA certificate held by Flexjet, but only if the suspension results from an accident reportable to the NTSB as an accident under the NTSB's rules and regulations.

"**Additional Interest Owners**" means the owners of interests in the Aircraft other than Owner.

"**Adjusted Exchange Hours**" means the product of (i) Owner's total Owner Occupied Hours in an Exchange Aircraft multiplied by the (ii) Differential Cost Factor for that aircraft.

"**Adjusted Exchange Usage Charge**" has the meaning set forth in the Management Agreement.

"**Affiliates**" means for purposes of the contractual documents among the Fractional Owners and the program manager, entities that share one-hundred percent (100%) common ownership by One Sky Flight, LLC, as identified in Flexjet's management specifications that are on file.

"**Aircraft**" means the aircraft in which Owner is purchasing the Interest, leasing the Interest, or in which the Interest is owned by Owner, as applicable.

"**Allocated Hours**" means the number of hours of Flight Time set forth in Schedule A to the Management Agreement for which Owner is entitled to use of the Aircraft in a specified Year.

"**Annual Adjustment Percentage**" means the greater of (i) the percentage set forth in Schedule A of the Management Agreement and (ii) the percentage change in the Consumer Price Index during the 12-month period ended November 30 of the immediately preceding calendar year.

"**Carry Over Hours**" means unused Allocated Hours in a given Year that Owner is entitled to use at the Occupied Hourly Rate during any other Year of the Term.

"**Commencement**" has the meaning set forth in the Lease Agreement.

"**Closing**" has the meaning set forth in the Purchase Agreement.

"**Consumer Price Index**" means the consumer price index for all Urban Consumers (CPI-U) – U.S. City Average, All Items (1982-84=100), as published by the Bureau of Labor Statistics.

"**Cumulative Ownership**" means the total Fractional Ownership Interest of Owner, an affiliate of Owner, or a party otherwise related to Owner, in Flexjet's fractional ownership program.

"**Differential Cost Factors**" means the factor assigned to an Exchange Aircraft to express the cost of owning, operating, and maintaining the Exchange Aircraft in relation to the cost of owning, operating, and maintaining the aircraft in which Owner has an interest. The Differential Cost Factors for the various makes and models of Exchange Aircraft are set forth on Schedule B to the Dry Lease Exchange Agreement.

"**Discontinuous Trips**" means any Trip that has a break in point-to-point continuity with another such Trip, in any 24 hour period. Flexjet has sole discretion to determine whether Discontinuous Trips require the use of more than one aircraft.

"**Dry Lease Exchange Agreement**" means a Program Agreement entered into among all owners of interests in aircraft operated under the fractional ownership program managed by Flexjet.

"**Excess Hours**" means hours used in excess of Allocated Hours for each Year, up to the Annual Available Hours limit set forth in Schedule A of the Management Agreement.

"**Effective Date**" means the date stated under Flexjet's signature at which the respective Program Agreement will become effective.

"**Exchange Aircraft**" means an aircraft in which Owner does not own or lease an interest, and that is made available to Owner by other Participants in the Exchange Program under the Dry Lease Exchange Agreement.

"**Exchange Program**" means the arrangement set forth in the Dry Lease Exchange Agreement under which owners of interests in specified aircraft make available to each other the aircraft in which they have an interest. Flexjet manages the fractional aircraft owners' interests and schedules aircraft from within the dry-lease exchange pool on behalf of fractional aircraft owners. Aircraft within the Flexjet exchange include aircraft managed by an Affiliate of Flexjet to the extent such aircraft are included in the fractional ownership program managed by the Affiliate and are included in Flexjet's dry-lease exchange agreements. In the event that Participant is operating an aircraft managed by an Affiliate of Flexjet, the flight related responsibilities of Flexjet apply, with respect to that particular flight, to the Affiliate, rather than to Flexjet.

"**European Service Area**" or "**ESA**" means Flexjet's European Region within the International Service Area.

"**FAA**" means the United States Federal Aviation Administration and any successor thereto.

"**FAR**" means the United States Federal Aviation Regulations or any successor laws.

"**Ferry Hours**" means Flight Time plus Taxi Time required to ferry the aircraft between an origination or termination point outside the Primary Service Area and the nearest suitable international airport within the contiguous United States.

"**Flight Segment**" means a continuous takeoff, flight, and landing.

"**Flight Time**" means the time elapsed between a takeoff and landing, accounted for to the nearest $1/10^{th}$ of one hour.

"**Force Majeure**" means an: (i) act of God; (ii) strike or lockout or other labor dispute; (iii) act of the public enemy; (iv) war (declared or undeclared); (v) blockade, revolution, or civil commotion; (vi) lightning, fire, storm, flood, or earthquake; (vii) explosion or act of terrorism, (viii) governmental restraint, (ix) embargo, (x) sudden or unexpected aircraft mechanical failure, (xi) act or occurrence that may compromise the safety of any Flight Segment in the reasonable view of Flexjet, an Affiliate, or any pilot of the Aircraft, (xii) inability to obtain or delay in obtaining governmental approvals, permits, licenses or allocations; and (xiii) any other cause whether of the kind specifically enumerated above or otherwise, provided that any such act or occurrence is not reasonably within the control of Flexjet.

"**Fractional Owner**" means any person owning an interest in a Program Aircraft.

"**Fractional Ownership Interest**" means (i) the ownership interest in a Program Aircraft; (ii) the holding of a multi-year leasehold interest in a Program Aircraft; or (iii) the holding or a multi-year leasehold interest that is convertible into an ownership interest in a Program Aircraft.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any arbitrator, court or tribunal of competent jurisdiction.

"**Interest**" means the undivided percentage interest in the Aircraft purchased and owned by Owner, or leased by Owner, in accordance with the terms of Program Agreements.

"**International Service Area**" or "**ISA**" means the European, Middle East and Asia Pacific regions, subject to change by Flexjet.

"**International Service Area Provisions**" means the current pricing, terms, and conditions for travel within the particular International Service Area region.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, or other requirement or rule of law of any Governmental Authority.

"**Lease Agreement**" means the Program Agreement under which Owner is Lessee of the Interest, when Owner holds the Interest under a lease.

"**Lease Invoice**" means the invoice for this lease, if applicable, that is provided to Owner by Flexjet setting forth the amount due for Commencement and Flexjet's wire instructions.

"**Lease Payment**" has the meaning set forth in the Lease Agreement.

"**Lien**" means any lien, claim, security interest, charge or encumbrance.

"**Management Agreement**" means a Program Agreement entered into between Flexjet and Owner for the management by Flexjet of the Interest.

"**Minimum Fractional Ownership Interest**" means, with respect to each type of aircraft, the holding of a Fractional Ownership Interest equal to or greater than 1/16 interest in an aircraft.

"**Minimum Term**" has the meaning set forth in the Purchase Agreement or Lease Agreement, as applicable.

"**MMF**" means the monthly management fee as set forth in the Management Agreement.

"**Multiple Use**" means use of two or more aircraft by Owner for either (i) a Flight Segment, a portion of which takes place at the same time that any portion of another Flight Segment is taking place, or (ii) Discontinuous Trips.

"**NTSB**" means the National Transportation Safety Board, or any successor agency.

"**Occupied Hourly Rate Deposit**" has the meaning set forth in the Management Agreement.

"**Owners**" means Owner and the Additional Interest Owners.

"**Owners Agreement**" means a Program Agreement entered into among all of the owners of the aircraft in which the Interest is owned.

"**Owner Occupied Hours**" equal, for each Flight Segment, the Flight Time plus Taxi Time, subject to adjustment by Flexjet in its reasonable discretion as a result of changes in applicable laws, rules, regulations or operating conditions that have the effect of prolonging the applicable Taxi Time.

"**Original Term**" has the meaning set forth in the Purchase Agreement or Lease Agreement, as applicable.

"**Part 91**" means FAR Part 91, Subpart K.

"**Part 135**" means FAR Part 135.

"**Participant(s)**" has the meaning set forth in the Dry Lease Exchange Agreement.

"**Preferred FBO**" means the fixed base operator whom Flexjet has designated as preferred for supply of fuel, ground handling, maintenance, line services and similar services at such airport.

"**Primary Service Area**" or "**PSA**" means the forty-eight (48) contiguous United States (excludes Alaska and Hawaii), the Bahamas, Mexico north of the twenty-third (23rd) Parallel plus Cabo San Lucas, and any point within two hundred twenty-five (225) statute miles of the outer border of the contiguous United States.

"**Program**" means the FAA-approved program, if any, whereby Flexjet manages the Owners' aircraft, and manages the dry lease exchange between the Participants, in connection with the conduct of fractional ownership program operations under FAR Part 91, Subpart K. However, when a Fractional Owner is operating a Program Aircraft in a fractional aircraft ownership program managed by an Affiliate of Flexjet, the flight-related responsibilities of the program manager apply, with respect to that particular flight, to Flexjet's Affiliate.

"**Program Agreements**" means the Purchase Agreement, the Lease Agreement, the Management Agreement, the Dry Lease Exchange Agreement, the Owners Agreement, and any other documents that Flexjet and Owner may agree upon, sign, and designate as a Program Agreement.

"**Program Aircraft**" means aircraft that are operated in accordance with the terms of the Program.

"**Proportionate Share**" means an Owner's percentage share of a given amount equal to the Owner's percentage ownership of the Aircraft.

"**Purchase Agreement**" means a Program Agreement entered into between Flexjet and Owner for the purchase of the Interest.

"**Purchase Invoice**" means the invoice for this purchase, if applicable, that is provided to Owner by Flexjet setting forth the amount due for Closing and Flexjet's wire instructions.

"**Qualified Fractional Owner**" means any Fractional Owner that has a Minimum Fractional Ownership Interest in at least one fractional program aircraft managed by the program manager or its Affiliate.

"**Secondary Service Area**" or "**SSA**" means Bermuda, the Greater, Lesser and Netherlands Antilles, Central America, and the balance of Mexico, the Caribbean, and Canada (except where access is restricted) that is not included within the Primary Service Area.

"**Taxes**" means federal, state, local and foreign taxes, charges, imposts, duties and excise taxes, head taxes, departure taxes, foreign fuel taxes and surcharges, and other similar assessments, including associated interest and penalties, but excluding net income or any other similar taxes imposed upon the net income of Flexjet.

"**Taxi Time**" means pre-takeoff or post-landing use of the aircraft. 1/10th of one hour will be added to each takeoff and to each landing for Taxi Time.

"**Trip**" means use by Owner of aircraft pursuant to the Management Agreement for either (a) multiple Flight Segments that are flown in a period of twenty-four (24) consecutive hours and that have point-to-point continuity in the itinerary for those Flight Segments, or (b) a single Flight Segment. For the avoidance of doubt, multiple Flight Segments departing from a common departure point constitute separate Trips (or parts of separate Trips) with a break in point-to-point continuity with one another, as do multiple Flight Segments arriving at a common destination.

"**Usage Charge**" has the meaning set forth in the Management Agreement.

"**Versatility Plus Program**" means a program administered by Flexjet, which allows Owners in Flexjet's fractional ownership program to (i) sell unused Allocated Hours, and (ii) purchase VP Hours for additional Flight Time per Year.

"**VP Hours**" means unused Allocated Hours, in whole hour increments, contributed to the Versatility Plus Program by Owner for purchase by Participants under a Dry Lease Exchange Agreement.

"**Year**" means each 12-month period beginning at 12:01 a.m. Eastern time on the date of the Management Agreement or on any anniversary of the date thereof.

2.    **TERMINATION.** Except as otherwise expressly provided in any Program Agreement, each of the Program Agreements shall expire when the Interest has been repurchased or terminated by Flexjet or otherwise assigned by Owner in accordance with the terms of the Purchase Agreement or Lease Agreement.

3.    **ENTIRE AGREEMENT.** The Program Agreements, including their respective attachments and schedules, constitute the entire understanding among the parties on the subject matter of said documents, and there are no representations, warranties, rights, obligations, liabilities, conditions, covenants or agreements other than as set forth in the Program Agreements.

4.    **SEVERABILITY.** In the event that any one or more of the provisions of any Program Agreement shall for any reason be held invalid, illegal or unenforceable, the remaining provisions thereof shall be unimpaired and the invalid, illegal or unenforceable provision shall be replaced by a mutually acceptable provision that (i) is valid, legal and enforceable and (ii) comes closest to the intention of the parties underlying the provision being replaced.

5.    **SUCCESSORS AND ASSIGNS.** Subject to any restrictions on assignment set forth in any Program Agreement, the rights and obligations of the parties under each Program Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of each party. Flexjet shall not assign its right under the Purchase Agreement, Lease Agreement, or the Management Agreement except to an entity qualified to fulfill Flexjet's responsibilities. Owner may not assign its rights under any Program Agreement except in conjunction with an assignment of the Interest permitted under the Purchase Agreement, an assignment of a leasehold interest in the Interest permitted under the Lease Agreement, or an assignment permitted by Flexjet in its discretion.

6.    **GOVERNING LAW AND VENUE.** The Program Agreements shall be governed by the laws of the state of Ohio without giving effect to Ohio's principles of conflict of laws, and shall be enforceable exclusively in the federal and state courts sitting in the Northern District of Ohio and in Cuyahoga County, Ohio, respectively. For such purpose, Owner hereby consents and irrevocably submits to the jurisdiction of such courts, agrees that all claims in respect of any Program Agreement may be heard and determined in either of such courts, and waives any objection (on the grounds of each of jurisdiction, forum non conveniens, or otherwise) to the jurisdiction of either such court. THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY PROGRAM AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

7.    **INDEMNIFICATION.** Subject to the limitations on liability set forth below or in any Program Agreement, Flexjet and Owner will each indemnify and hold harmless the other party, its owners, managers, directors, officers, agents and employees, from and against any and all loss, cost, damage, injury or expense that may be incurred by reason of any breach by the indemnifying party of any of its representations or obligations set forth in any Program Agreement. A party seeking indemnification hereunder shall promptly give notice to the indemnifying party of the initiation by any third party of an action expected to be covered hereby, and the indemnifying party shall be entitled to participate in the defense of any such action by counsel of its own choosing. Each party will also indemnify and hold harmless the other against any loss sustained or reasonable expense incurred by that other party as the direct result of or arising out of the imposition on the Aircraft, or the Interest, of any federal or other tax lien or the foreclosure thereof by virtue of the failure to pay or underpayment by the indemnifying party of federal or other taxes payable by the indemnifying party, including without limitation any portion of property taxes on the Aircraft that are the responsibility of Owner, as the purchaser and/or owner of the Interest. Notwithstanding anything herein to the contrary, in no event will the aggregate liability of either party under this section 7 exceed the limits of the liability insurance required to be obtained under the Management Agreement, and neither party shall be liable for, or indemnify the other party against, indirect, special or consequential damages suffered by the other party.

8.    **LIMITATION OF LIABILITY.** NO PARTY SHALL, IN ANY EVENT, BE LIABLE TO ANY OTHER PARTY TO A PROGRAM AGREEMENT FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, LOST PROFITS OR PUNITIVE DAMAGES OF ANY KIND OR NATURE UNDER ANY CIRCUMSTANCES OR FOR ANY REASON. IN PARTICULAR AND WITHOUT LIMITATION, (A) FLEXJET SHALL NOT BE LIABLE TO OWNER FOR ANY SUCH DAMAGES OF ANY KIND UNDER ANY CIRCUMSTANCES ARISING OUT OF THE PURCHASE OF THE INTEREST OR ANY LACK OR LOSS OF USE OF ANY AIRCRAFT, EQUIPMENT, SPARE PARTS, MAINTENANCE, REPAIR OR SERVICES RENDERED OR DELIVERED IN ACCORDANCE WITH THE PURCHASE AGREEMENT, AND (B) FLEXJET SHALL NOT BE LIABLE TO OWNER FOR ANY SUCH DAMAGES FOR ANY LOSS DUE TO ANY DELAY BY FLEXJET IN FURNISHING OR FAILURE BY FLEXJET TO FURNISH THE AIRCRAFT OR CAUSED OR OCCASIONED BY THE PERFORMANCE OR NON-PERFORMANCE OF ANY SERVICES COVERED BY THE MANAGEMENT AGREEMENT.

9.      **NOTICES.** Notice under any Program Agreement shall be in writing and sufficiently given if personally delivered or sent by registered or certified mail, commercial courier, facsimile or electronic mail to the recipient at its address set forth in the Purchase Agreement, Lease Agreement, or any other applicable Program Agreement, or at such other address as the recipient shall have specified by notice. Notice shall be effective on the earlier of three (3) days following its sending or the time of actual receipt.

10.      **CONSTRUCTION.** For the purposes of each of the Program Agreements, (a) words in the singular include the plural and vice versa and words of one gender include the other gender as the context requires; (b) the terms "hereof," "herein," and "herewith" and words of similar import will, unless otherwise stated, be construed to refer to the agreement as a whole in which they appear (including all of the schedules and exhibits hereto) and not to any particular provision of the agreement, and article, section, paragraph, schedule and attachment references are to the articles, sections, paragraphs, schedules, and attachments to the agreement in which the reference appears unless otherwise specified; (c) the word "including" and words of similar import mean "including without limitation" unless otherwise specified; (d) the word "or" shall not be exclusive, unless the context otherwise requires; (e) all references to any period of days will be to the relevant number of calendar days unless otherwise specified; (f) in the case of interests subject to lease, the term "Owners" as used in the Program Agreements refers to the Lessees of such Interests; and (g) references in the Program Agreements to ownership of interests (whether the Interest or other fractional interests) also refer to the holding of such interests under a lease.

11.      **RELATIONSHIP OF PARTIES.** Nothing contained within the Program Agreements shall be deemed to constitute a partnership, joint venture, or any business organization of any kind among the signatory parties of the Program Agreements.

12.      **ELECTRONIC SIGNATURE.** Owner and Flexjet agree that: (a) receipt of information electronically that the recipient reasonably believes to be authorized by the transmitting party shall constitute the valid signature on behalf of the transmitting party (it being agreed that transmission from an email address identified by Owner as an authorized email address of Owner shall be reasonable to accept); (b) such electronic transmissions shall be deemed to satisfy any federal, state or local laws or regulations requiring that agreements be in writing; (c) neither party shall contest the validity or enforceability of any such electronic transmission; and (d) computer maintained records, when produced in hard copy form, shall constitute business records and shall have the same validity as any other generally recognized business records.

13.      **EFFECTIVENESS: DATE.** Each individual Program Agreement will become effective when all parties have signed it.  The date of each Program Agreement will be the date stated under Flexjet's signature.

*[Signature Page Follows]*

The parties have executed the General Terms and Conditions on the date stated under Flexjet's signature. The General Terms and Conditions may be executed by ink, facsimile, or other electronic signature in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one agreement.

**OWNER: Bradsher Transport, LLC**

By _____
A274D5A5ABFD4A7...

Printed Name: G. Nenninger

Title (if applicable): _____

**FLEXJET, LLC**

By _____
F48C711C8DAB460...

Printed Name: Mike Metera

Title: VP, Admin & Contracts

Date: 5/1/2019



# LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "**Agreement**") is made by **FLEXJET, LLC**, a Delaware limited liability company, 26180 Curtiss Wright Parkway, Cleveland, Ohio 44143 ("**Flexjet**"), and **Sklar Transport, LLC**, 5395 Pearl Parkway, Suite 200, Boulder, CO 80301 ("**Owner**"). The Owner desires to lease from Flexjet an Interest in the Aircraft set forth in Schedule A. Owner has also retained Flexjet to manage the Interest under the terms of the Management Agreement, and Owner and Flexjet are parties to a Dry Lease Exchange Agreement. Capitalized terms that are not defined in this Agreement have the meanings ascribed to them in the General Terms and Conditions Agreement.

The parties therefore agree as follows:

1. **LEASE OF INTEREST**

    1.1 <u>Conveyance of Interest.</u>  The consummation of the lease of the Interest (the "**Commencement**") will take place when all conditions set forth in section 3 have been met. At the Commencement, Owner will lease the Interest from Flexjet for the length of time set forth in Schedule A (the "**Original Term**"). The Original Term will begin on the "**Commencement Date**", and terminate on the "**Termination Date**" (in each case as set forth in Schedule A), or as earlier terminated under the terms of this Agreement or under any Program Agreement.

    1.2 <u>Lease Payment.</u> Owner will pay Flexjet the "**Lease Payment**" set forth on Schedule A, payable in advance and due on the first day of each month until the termination of this Lease Agreement, with the first month's Lease Payment being due on the Commencement Date. All payments of the Lease Payment must be by electronic funds transfer ("**EFT**") to Flexjet's bank. At the Commencement, Owner will also pay to Flexjet the "**Security Deposit**" (as set forth in Schedule A) for the Interest, which shall be returned to Owner at the end of this Agreement less any itemized amounts owed first to Flexjet under any Program Agreement. The Security Deposit shall not be used by Owner to pay any portion of payment due under this Lease Agreement. All payments due under this Agreement will be "net to Flexjet" and Owner will be responsible for any sales, use, or similar taxes, and any interest or penalties on such taxes (unless such interest or penalty results from an act or omission of Flexjet not authorized by Owner), payable to any governmental authority on account of Owner's lease of the interest or use of the Aircraft, excluding taxes imposed on Flexjet on account of its net income. Flexjet may charge Owner applicable sales and use tax (set forth in Schedule A) on the lease of the Interest and remit to the applicable taxing authority. Flexjet will promptly provide notice to Owner of any audit, claim, assessment or other procedure that may lead to tax liability of Owner as described above. Owner will pay to Flexjet the amount of any tax assessed against Flexjet with respect to Owner's lease of the Interest or use of the Aircraft, and any related penalties and interest, within ten days after receiving written notice thereof from Flexjet; provided that Owner may at its expense and as permitted by applicable law, contest in good faith Flexjet's obligation to pay any such amounts so long as (a) such proceedings do not, in the reasonable opinion of Flexjet, create any material risk of the sale, forfeiture or loss of the Aircraft or any interest in the Aircraft or impose any additional liability on Flexjet, and (b) Owner fully indemnifies Flexjet with respect to such contested obligations and posts adequate security for such indemnification. If Owner fails to pay any amount payable to Flexjet promptly when due, a 15% per annum late charge will be applied to the late payment amount from the payment due date until Flexjet receives the payment.

    1.3 <u>Owner's Inspection Rights.</u>  Owner has the right at its expense to inspect the Aircraft and its log books and other records prior to the Commencement to ascertain the condition of the Aircraft.

2. **REPRESENTATIONS AND WARRANTIES**

    2.1 <u>Representations and Warranties of Flexjet</u>. Flexjet represents and warrants to Owner that:

    (a)  (i) the Aircraft will be in good working order and repair, have a valid Certificate of Airworthiness with no restrictions or limitations issued by the FAA with all airworthiness directives and required inspections current, and be as described in Schedule A, and (ii) no defaults of Flexjet or conditions which, with the giving of notice or passage of time or both, would constitute defaults of Flexjet under the Program Agreements will exist.

    (b)  The Aircraft will have been inspected and maintained within the prior 12 month period (or the period of its existence if the Aircraft is less than 12 months old) in accordance with the provisions of Part 135 or Part 91.409(f)(1) or Part 91.409(f)(3) and all applicable requirements for maintenance and inspection thereunder. Flexjet acknowledges that Owner will rely upon this representation in making a similar representation under the Dry Lease Exchange Agreement.

    (c)  Flexjet is duly organized and existing in good standing under the laws of the state of Delaware, and Flexjet has the power and authority to enter into this Agreement and carry out the transaction contemplated hereby.

    (d)  Flexjet has title to the Interest (or a leasehold interest therein) for a period no shorter than the Original Term.

    (e)  No consent or approval of, notice to, registration with, or taking of any other action in respect of or by, any federal, state or local government authority or agency or other person is required with respect to the execution, delivery and performance by Flexjet of this Lease, or if any such approval, notice, registration or action is required, it has been duly given or obtained.

2.2    Representations and Warranties of Owner. Owner represents and warrants to Flexjet that:

(a)    Owner has the power and authority to enter into and carry out the transaction contemplated by this Agreement.

(b)    Owner will not create any liens on or with respect to the Interest, the Aircraft, any part of the Aircraft, or Flexjet's title to the aircraft.

2.3    Survival. The representations, warranties, and covenants made in this Agreement will survive indefinitely.

3.    **CONDITIONS PRECEDENT TO COMMENCEMENT**

3.1    Conditions to Flexjet's Obligation. Flexjet's obligation to lease the Interest to Owner is subject to Owner's performance of all of its obligations to be performed on or prior to the Commencement, including the following:

(a)    Owner shall have paid to Flexjet the Security Deposit, first month Lease Payment, first month MMF, the Occupied Hourly Rate Deposit, and the applicable sales and use tax.

(b)    Owner shall have executed and delivered to Flexjet the Program Agreements and Attachment A to this Agreement ("**Aircraft Leasehold Interest Acceptance Form**").

3.2    Conditions to Owner's Obligation. Owner's obligation to lease the Interest from Flexjet is subject to Flexjet's performance of all of its obligations to be performed on or prior to the Commencement Date, including the following:

(a)    Flexjet shall have executed and delivered to Owner the Program Agreements, and the Dry Lease Exchange Agreement shall be in full effect as to all other parties.

(b)    Owner shall have satisfied itself, at its expense, as to the condition of the Aircraft and its records and as to policies of insurance that are to be provided under the Management Agreement.

(c)    Flexjet shall have delivered to Owner the certificate of insurance required to be delivered upon execution of the Management Agreement.

4.    **TERMINATION OF THE LEASEHOLD INTEREST.** Upon termination of this Agreement, Owner's rights in the Interest will expire, and Flexjet will be deemed to have accepted the Interest back from Owner. Owner may terminate this Agreement on, or after, the "**Minimum Term**" (set forth in Schedule A), subject to Owner providing Flexjet with 90 days' notice. Owner acknowledges that in the event of termination prior to the Minimum Term: (i) the Lease Payment will be due in ordinary course through the Minimum Term, and (ii) Flexjet will retain the Security Deposit received from Owner. If an event of default by Flexjet under the Management Agreement has occurred and is continuing, Owner will have the right to terminate this Agreement.

5.    **EXCHANGE OF INTEREST IN AIRCRAFT.** Flexjet may substitute the Interest with an interest in another aircraft that provides economic value equal to or greater than that of the Interest (a "**Substitute Interest**"). Flexjet will notify Owner of the substitution and the Substitute Interest will become the Interest for purposes of the Program Agreements. Flexjet will complete the substitution at no cost to Owner and the Program Agreements will be amended to reflect the substitution.

6.    **ASSIGNMENT OF THE INTEREST.** Owner is prohibited from assigning the Interest (including by operation of law) to any other person, or entity, without Flexjet's prior written consent. If Owner is an entity, a change in the ownership of more than 50% of the voting control of Owner following the date of this Agreement (a "**Change of Control**") constitutes an assignment of the Interest for purposes of this section 6. Any purported assignment of the Interest in violation of this section 6 is void. Flexjet will not unreasonably withhold consent to Owner's assignment of the Interest (a) to any affiliate of Owner, (b) to any entity into which Owner is merged or to which Owner assigns all or substantially all of its assets and business, (c) to a non-affiliate (third party) of Owner, or (d) pursuant to a Change of Control, provided in each case that Flexjet may consider at least the following matters in determining whether or not to provide its consent: (w) the assignee (including Owner in a Change of Control) may not be an entity whose sole material purpose is to own the Interest unless such entity engages solely in "dry" leasing activities, (x) the assignee (including Owner in a Change of Control) must be a citizen of the United States (as defined in 49 U.S.C. Section 40102, as amended) or otherwise eligible to register aircraft with the FAA pursuant to FAR Part 47, (y) the assignee's (including Owner in a Change of Control) creditworthiness, geographic location and aircraft usage pattern must be reasonably satisfactory to Flexjet, and (z) the assignee must assume all of Owner's obligations under the Program Agreements. Any assignment of the Interest that requires a repositioning of the Aircraft is subject to a $5,000 assignment fee, paid by Owner to Flexjet, prior to the assignment. No such assignment will relieve Owner of any liabilities accrued prior to such assignment.

7.    **SALE OF ADDITIONAL INTERESTS.** Flexjet reserves the right to sell or lease fractional ownership interests for the portion of the Aircraft not leased by Owner to such other persons, firms or entities as Flexjet, in its sole discretion, deems acceptable, as long as all Additional Interest Owners execute a management agreement similar to the Management Agreement and enter into the Owners Agreement and the Dry Lease Exchange Agreement. Owner's lease of the Interest creates a tenancy-in-common as to the Aircraft among Owner and the Additional Interest Owners, who will own in the aggregate exactly 100% of the Aircraft.

8.  **SUBORDINATION.**  Owner acknowledges that the Aircraft, or the Interest, is now or may become subject and subordinate to a present or future lease, loan, or other security agreement ("**Security Agreement**") between Flexjet and a bank or other lending institution ("**Lender**").   If Flexjet defaults on its obligations under the Security Agreement, Lender may exercise all of its rights and remedies, available to it at law or in equity, with respect to the Aircraft or the Interest, including terminating this Lease Agreement. Owner will remain obligated to perform all of its obligations under this Lease Agreement unless Lender terminates this Lease Agreement or exercises its other default remedies against the Aircraft. Owner and Flexjet acknowledge that a Lender is a third party beneficiary of the subordination set forth in this Lease Agreement.

9.  **LIMITATION OF LIABILITY.** EXCEPT AS SET FORTH IN THIS LEASE AGREEMENT, FLEXJET DOES NOT MAKE, GIVE, OR EXTEND ANY WARRANTIES OR REPRESENTATIONS OR ASSUME ANY OBLIGATIONS OR LIABILITIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, ARISING BY LAW OR EQUITY, IN CONTRACT, IN TORT OR OTHERWISE, CONCERNING (a) THE AIRCRAFT OR ITS CONDITION, FITNESS FOR A PARTICULAR PURPOSE, AIRWORTHINESS, DESIGN, OPERATION OR MERCHANTABILITY OR (b) ANY OTHER OBLIGATION OR LIABILITY ON THE PART OF FLEXJET TO ANYONE OF ANY NATURE WHATSOEVER BY REASON OF THE DESIGN, MANUFACTURE, SALE, REPAIR, LEASE OR USE OF THE AIRCRAFT OR THE INTEREST AND ANY SERVICES DELIVERED OR RENDERED UNDER THIS AGREEMENT.

The parties have executed this Lease Agreement on the date stated under Flexjet, LLC's signature. This Lease Agreement may be executed by ink, facsimile, or other electronic signature in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one agreement.

**OWNER: Sky Transport, LLC**

By: _____
A274D5A5ABFD4A7...

Printed Name:  G. Nenninger

Title (if applicable):  _____


**FLEXJET, LLC.**

By: _____
F48C711C8DAB460...

Printed Name:  Mike Metera

Title:  VP, Admin & Contracts

Date:  5/1/2019

**SCHEDULE A**
**TO THE LEASE AGREEMENT**

<u>Leasehold Interest:</u>

A leasehold interest in an undivided 9.375% interest in the Aircraft. The Aircraft includes (i) the airframe together with all engines, appurtenances, appliances, parts, instruments, accessions, furnishings, log books, equipment manuals and other equipment of whatever nature incorporated in or contained in or attached to the Aircraft and (ii) all assignable manufacturer's warranties.

<u>Aircraft:</u>

| | |
|---|---|
| Aircraft Model: | Phenom 300 |
| Serial Number: | 50500233 |
| FAA Registration: | N360FX |

<u>Term:</u>

| | | |
|---|---|---|
| Commencement Date: | 5/1/2019 | (*see* section 1.1) |
| Termination Date: | 4/30/2024 | (*see* section 1.1) |
| Original Term: | 60 | months (*see* section 1.1) |
| Minimum Term: | 12 | months (*see* section 4) |

<u>Lease Payment:</u>

| | | |
|---|---|---|
| Monthly Lease Payment: | $9,282.00 | per month (*see* section 1.2) |

<u>Sums due at Commencement:</u>

| | | |
|---|---|---|
| Monthly Lease Payment: | $9,282.00 | per month (*see* section 1.2) |
| Security Deposit: | $45,000.00 | (*see* section 1.2) |
| Ohio Sales and Use Tax: | $75.00 | (*see* section 1.2) |
| First month's Monthly Management Fee:* | $13,073.00 | (*see* section 3.1(a)) |
| Occupied Hourly Rate Deposit:* | $19,181.00 | (*see* section 3.1(a)) |
| **Total Due at Commencement:** | **$86,611.00** | |

*Subject to the terms of the Management Agreement

**ATTACHMENT A**
**TO THE LEASE AGREEMENT**

**AIRCRAFT LEASEHOLD INTEREST ACCEPTANCE FORM**

**Sklar Transport, LLC** ("**Owner**") hereby acknowledges acceptance of a leasehold interest in an undivided 9.375% interest in the Aircraft described below from **FLEXJET, LLC** ("**Flexjet**"), and Flexjet hereby accepts this instrument in the state of _____ on _____.

One Phenom 300 aircraft bearing manufacturer's serial number 50500233, together with two Pratt & Whitney PW 535-E engines and all equipment, parts, instruments, appurtenances, and other property installed in or attached to the Aircraft or engines.

**OWNER: Sklar Transport, LLC**

By _____
A274D5A5ABFD4A7...

Printed Name:  G. Nenninger

Title (if applicable): _____

**FLEXJET, LLC**

By: _____
F48C711C8DAB460...

Printed Name:  Mike Metera

Title:  VP, Admin & Contracts

Date:  5/1/2019



## MANAGEMENT AGREEMENT

**THIS MANAGEMENT AGREEMENT** (this "**Agreement**") is between **FLEXJET, LLC**, a Delaware limited liability company, 26180 Curtiss Wright Parkway, Cleveland, Ohio 44143 ("**Flexjet**"), and **Sklar Transport, LLC**, 5395 Pearl Parkway, Suite 200, Boulder, CO 80301 ("**Owner**"). Owner either purchased and owns an Interest under a Purchase Agreement, or leases an Interest under a Lease Agreement, and desires to retain Flexjet to manage the Interest. The Additional Interest Owners have also retained Flexjet to manage their interests in the Aircraft under management agreements. Owners and Flexjet are also parties to a Dry Lease Exchange Agreement, and Owner, if Owner owns the Interest, is a party to an Owners Agreement with the Additional Interest Owners. Capitalized terms that are not defined in this Agreement have the meanings ascribed to them in the General Terms and Conditions Agreement.

The parties therefore agree as follows:

1. **PROVISION OF MANAGEMENT SERVICES.**

    1.1 <u>Engagement of Flexjet</u>. Owner engages Flexjet, and Flexjet agrees, to manage the Interest for the benefit of Owner under the Program Agreements.

    1.2 <u>Compliance with Regulations</u>. Flexjet will use, manage, and maintain the Aircraft for the benefit and at the direction of Owner and the Additional Interest Owners upon and subject to the terms and conditions of this Agreement and in compliance with all applicable Laws. During the Term (as defined in section 2) Owner has the option to elect to have its Allocated Hours operated under (1) Part 135 in which case Flexjet will be in operational control, or (ii) Part 91 in which case the Owner will be in operational control. In accordance with FAR section 91.1013, Owner acknowledges that it has read and understands its responsibilities with respect to the operational control of the Aircraft, or Exchange Aircraft, as set forth in Attachment A.

2. **TERM.** The term of this Agreement commences upon the Closing under the Purchase Agreement or upon the Commencement under the Lease Agreement, as applicable, and will terminate as set forth in the General Terms and Conditions Agreement (the "**Term**").

3. **SERVICES PROVIDED BY FLEXJET.** Flexjet will, at its sole cost and expense (except as otherwise provided in this Agreement), provide, or cause to be provided, the services described in this section 3. Flexjet has no obligation to perform any service not explicitly set forth in this section 3 or otherwise required of a "**Program Manager**" as defined in Part 91.

    3.1 <u>Maintenance of the Aircraft</u>. Flexjet will (a) cause the Aircraft to be used, operated, inspected, maintained, serviced, repaired, overhauled, and tested by duly licensed, competent personnel in accordance with FAA, manufacturer, or other FAA-approved inspection programs, (b) maintain in good standing the airworthiness certification of the Aircraft, and (c) keep the Aircraft in good cosmetic appearance as determined by Flexjet in its reasonable discretion.

    3.2 <u>Maintenance of Records; Access</u>. Flexjet will cause all records, logs and other materials required by the FAA to be maintained in respect of the Aircraft and will make all filings necessary to maintain current Aircraft registration with the FAA. Owner may, upon two business days' prior written notice to Flexjet and at Owner's own expense, inspect and copy the Aircraft's records, logs and other materials during Flexjet's normal business hours as long as it does not interfere with Flexjet's daily operations. Owner will cooperate with Flexjet in good faith in connection with the performance of Flexjet's obligations pursuant to this section 3.2. Any manuals used by Flexjet in connection with the services provided under this Agreement are the exclusive property of Flexjet.

    3.3 <u>Geographic Operation</u>. Flexjet will not permit the Aircraft to be operated or located in any geographic location excluded from coverage by any insurance required to be maintained pursuant to this Agreement.

    3.4 <u>Pilots and Ground Services</u>. Flexjet will provide professionally trained and qualified pilots who are familiar with and licensed to operate the Aircraft. Flexjet will ensure that all recurrent pilot training is completed and provide pilot medical examinations and uniforms, a computerized maintenance program, hangar space when required, general storage space for Aircraft items, tie-down as required, flight planning and weather services, catering per standard menu, fueling, administrative communications and, if possible, aeronautical radio services (or equivalent).

    3.5 <u>Flight Arrangements</u>. Flexjet will, on Owner's behalf, make all necessary take-off, flight, and landing arrangements involved in Owner's use of the Aircraft. At Owner's request and expense, Flexjet will also use reasonable efforts to coordinate related ground transportation.

    3.6 <u>Insurance</u>.

        (a) Flexjet will obtain (i) customary all-risk hull insurance against any loss, theft, or damage to the Aircraft (including any engines or parts while removed from the Aircraft) for an amount not less than the market value of the Aircraft naming Owner, any lender to Owner that holds a Lien on the Interest (a "**Lender**"), Additional Interest Owners, Flexjet and such other parties as Flexjet reasonably designates as insured parties or loss payees with losses payable in accordance with section 6; and (ii) liability insurance for bodily injury and property damage (which includes a war risk and allied perils endorsement with a minimum of $50 million combined single limits, except where higher limits are required by law) related to the Aircraft and its operation in the amount set forth in Schedule A for liability insurance, naming Owners, Flexjet and such other parties as Flexjet and Owner may reasonably designate as

insured parties. The insurance offered under this Agreement will be at Flexjet's expense, except that Owner must pay its share, based upon Owner's Interest in the Aircraft, of any changes in insurance premiums from this Agreement's Effective Date. Flexjet will apply an additional charge to any Trip to the European Union to cover the required increased insurance coverage, in compliance with Regulation (EC) No. 785/2004 of the European Parliament (the "**EU Trip Charge**" as set forth in Schedule A).

(b)  At Owner's expense and request, Flexjet will reasonably cooperate with Owner's efforts to obtain liability insurance coverage in excess of the amounts Flexjet is required to obtain under this Agreement. The insurance required by this section 3.6 will (i) contain a breach of warranty endorsement in favor of Flexjet, Owner, the Lender, and Additional Interest Owners; (ii) permit the waiver of subrogation set forth in the other Program Agreements; (iii) contain an "additional interest endorsement" assuring that loss payee coverage for the holders of authorized Liens on interests in the Aircraft will not be invalidated by acts or neglect of the named insureds; (iv) contain a policy condition customary for fractionally owned or managed aircraft designating Flexjet as the "first named insured"; and (v) will provide that named insured coverage for the Owners will not be invalidated by acts or neglect of the first named insured. OWNER AGREES THAT IN THE CASE OF AN INSURABLE EVENT THE PROCEEDS OF INSURANCE TO WHICH IT IS ENTITLED WILL BE OWNER'S SOLE RECOURSE AGAINST FLEXJET FOR ALL DAMAGES ARISING IN CONNECTION WITH THAT INSURABLE EVENT, EXCEPT FOR DAMAGES RESULTING FROM FLEXJET'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

3.7  <u>Owner Assistance Services</u>. Flexjet will provide assistance regarding (a) acceptance of Aircraft delivery; (b) FAA and manufacturer correspondence; (c) administration, enforcement and settlement of Aircraft warranty claims and insurance matters; (d) Aircraft parts replacement, services, and maintenance arrangements; and (e) preparation and filing of FAA and Federal Communications Commission mandatory reports and registrations.

3.8  <u>Exchange Services</u>. Flexjet will provide all administrative services required for Owner's participation in the Exchange Program.

3.9  <u>FAA Notices</u>. Owner designates Flexjet to act as Owner's agent to receive and accept service of FAA notices regarding Flexjet's fractional ownership program and authorizes the FAA to send such notices to Flexjet on Owner's behalf. Flexjet and Owner both acknowledge that the FAA may contact Owner directly at its discretion.

4.  **COMPENSATION AND REIMBURSEMENT**. Owner will pay Flexjet the following compensation:

4.1  <u>Monthly Management Fee</u>. The monthly management fee ("**MMF**") set forth in Schedule A is payable in advance on the first day of each month. The first payment is due on the Effective Date of this Agreement. All payments of the MMF must be by electronic funds transfer ("**EFT**") to Flexjet's bank. Owner will authorize Flexjet to initiate MMF payments with an Authorization Agreement for Electronic Funds Transfer in the form of Attachment B. The Authorization Agreement shall provide that it may be cancelled by Owner upon 30 days prior written notice to Flexjet. In the event of any such cancellation, or if any portion of the MMF is not paid by EFT for any other reason, Owner shall pay the MMF or such unpaid portions pursuant to invoices received from Flexjet as contemplated by this section 4.1. No payment to Flexjet under any Program Agreement may be made by credit card.

4.2  <u>Usage Charge</u>. For each Flight Segment, Owner will pay a "**Usage Charge**" equal to the product of (a) the sum of the "**Occupied Hourly Rate**" plus the "**Fuel Component Adjustment**" (in each case as set forth in Schedule A), multiplied by (b) the number of Owner Occupied Hours used for that Flight Segment. Flexjet will invoice owner for Usage Charges at the end of each month, with payment due 15 days from the invoice date.

4.3  <u>Occupied Hourly Rate Deposit</u>. On the Effective Date of this Agreement, Owner will pay Flexjet a deposit equal to the product of (a) 1/12[th] of the Owner's Allocated Hours for one Year, multiplied by (b) the Occupied Hourly Rate plus the Fuel Component Adjustment on the date set forth in Schedule A. This deposit will not bear interest and will be refunded to Owner following the payment of all amounts due to Flexjet upon termination of this Agreement.

4.4  <u>Annual Adjustments</u>. Flexjet will increase the MMF, applicable Crew Member Expenses, and the Occupied Hourly Rate on January 1st of each calendar year during the Term by the Annual Adjustment Percentage, as defined in the General Terms and Conditions Agreement and set forth in Schedule A.

4.5  <u>Other Fees and Adjustments</u>.

(a)  At the end of the Original Term and at the end of each 24th month thereafter, the MMF and Occupied Hourly Rate will be adjusted to the program rates then in effect for the make, model and year of the Aircraft, and the other terms and conditions of this Agreement will be amended to match the terms and conditions prevailing in Flexjet's standard form of management agreement for aircraft of that make, model and year. Owner will at Flexjet's request execute and return to Flexjet a revised Management Agreement that reflects these changes effective as of the applicable anniversary date.

(b)  If Owner elects to have the Aircraft use a non-Preferred FBO at any airport where there is a fixed base operator that Flexjet has designated as a Preferred FBO, Owner will be charged a service fee equal to 10% of the Usage Charge for the Flight Segments immediately preceding and following that airport visit.

4.6  <u>Taxes and Other Expenses</u>. Owner is responsible for its Proportionate Share (or other reasonable allocation adopted by Flexjet) of all Taxes arising from Owner's acquisition of the Interest and the ownership, operation, maintenance, or use of the Aircraft.

Flexjet will collect from Owner, and remit to the federal government, the federal transportation excise taxes and federal surtaxes on the Usage Charge and MMF, subject to Owner's qualification as a **Qualified Fractional Owner**" under the Federal Aviation Administration Modernization and Reform Act of 2012. Owner will pay all amounts incurred on its flights for use of flight phones and internet on the Aircraft, catering charges in excess of standard menu, all special governmental charges at airports attributable to Owner's flight, all landing permits and fees, immigration, customs, handling, overflight charges, navigation and airspace fees and similar charges. If Flexjet pays fuel taxes for which it later obtains a refund, Owner will not be charged for such taxes and Flexjet will retain the refund.

4.7     Expenses for Wear and Tear. Owner will reimburse Flexjet for any costs incurred by Flexjet resulting from extraordinary wear, tear or damage to the Aircraft caused by Owner or Owner's guests and not covered by insurance.

4.8     FAA Expenses. Owner will pay its Proportionate Share of the cost of complying with airworthiness directives, manufacturer's alert/mandatory service bulletins and manufacturer's recommended service bulletins applicable to the Aircraft. Owner will also pay its Proportionate Share of the cost of complying with any new requirements of the FAR Part under which Flexjet's fractional ownership program is operated. Flexjet will use reasonable efforts to pursue reimbursement for such costs from the appropriate party.

4.9     Late Fee. If Owner fails to pay any amount payable to Flexjet promptly when due, a 15% per annum late charge will be applied to the late payment amount from the payment due date until Flexjet receives the payment.

4.10    Flexjet's Use of the Aircraft. Flexjet has the right to use the Aircraft when the Aircraft is not being used by Owner or under the Dry Lease Exchange Agreement, subject to its compliance with the requirements of all applicable insurance coverage and governmental regulations. Flexjet is responsible for the operating cost incurred for any such use and may retain for its own account any reimbursement or compensation received by Flexjet for such use. While using the Aircraft pursuant to this section 4.10, Flexjet will be deemed the operator of the Aircraft and will reimburse Owner for Taxes actually incurred by Owner that arise from Flexjet's use of the Aircraft.

5.      **AVAILABILITY AND OPERATION OF AIRCRAFT.**

5.1     Available Hours.

(a)     Owner is entitled to use an aircraft each Year for the amount of hours equal to the sum of (i) Allocated Hours, plus (ii) available Excess Hours, plus (iii) available Carry Over Hours, plus (iv) VP Hours, subject to the restrictions set forth in section 5 (the "**Annual Available Hours**" set forth in Schedule A). Any Excess Hours flown in a Year will be charged against Allocated Hours for the following Year.

(b)     If, upon termination of this Agreement, the number of Owner's total Owner Occupied Hours (plus VP Hours sold, if applicable) exceeds the prorated number of Owner's total accrued Allocated Hours, then in addition to applicable Usage Charges, Owner will pay an additional amount equal to the MMF (and Lease Payment, as applicable) that would have been payable if the Term covered a period of time sufficient to generate Allocated Hours equal to Owner's actual Owner Occupied Hours. Owner will forfeit unused Allocated Hours at the termination of this Agreement, subject to the exception set forth below in section 5.1(c).

(c)     If Owner elects to trade in the Interest to cover a portion of the Purchase Price for an interest of equal or larger percentage size in an aircraft that is of greater value or larger cabin class than the Aircraft, up to 10% of the unused or unsold accrued Allocated Hours (the "**Unused Allocated Hours**") will be added to the new management agreement for the first Year, subject to the restrictions set forth in section 5.1. If Owner is purchasing an interest in an aircraft of a make or model different from that of the Aircraft, the Unused Allocated Hours will be subject to the Differential Cost Factor.

5.2     Versatility Plus Program.

(a)     Owner may contribute unused Allocated Hours to the Versatility Plus Program to be sold through Flexjet, subject to the "**VP Hour Contribution Limit**" set forth in Schedule A. Owner's Allocated Hours will be reduced by VP Hours sold, and Owner's account will be credited an amount equal to (i) the number of VP Hours sold multiplied by (ii) Flexjet's then current published rate. All VP Hours contributed to the program will be sold on a first in, first out basis.

(b)     If Owner requires Flight Time in addition to the Annual Available Hours, Owner may purchase VP Hours from the Versatility Plus Program. VP Hours will be purchased at Flexjet's then current published rate, and Owner will incur a usage charge for the specific model aircraft flown.  Owner must use purchased VP Hours within 12 months of the purchase date.

(c)     Owner acknowledges that (i) the Versatility Plus Program and VP Hours are subject to change  and availability, (ii) Flexjet may discontinue the Versatility Plus Program, provided Owner receives 180 days notice, (iii) use of VP Hours on Peak Travel Days (as defined in 5.5(b)) at Flexjet's discretion, (iv) VP Hours will be operated under Part 135, and (v) upon termination of this agreement, all unsold VP Hours will be removed from the Versatility Plus Program and Owner will not be reimbursed for the unsold hours. The use, purchase, and sale of VP Hours are subject to the restrictions set forth in section 5.1.

5.3     Use of Hours.

(a)     Owner's Annual Available Hours will be reduced by all Flight Time plus Taxi Time, including any Flight Time deemed to be used pursuant to this section 5.3(a). Each Flight Segment, including Taxi Time, will be deemed to be a minimum of

one hour's duration, except for (i) two Flight Segments per Year, for every 6.25% increment of the interest owned (or leased), as designated by Owner (the "**Short Leg Exclusions**" as set forth in Schedule A), (ii) any Flight Segment caused solely by maintenance, weather, government regulation, or any fuel stops necessitated by the airport of departure for a specific leg, in which event Owner will be charged for actual Owner Occupied Hours for that Flight Segment, or (iii) any Flight Segment that occurs on a calendar day in which Owner uses the Aircraft for at least four Owner Occupied Hours. Short Leg Exclusions are not valid for trips within the SSA.

(b)     Owner will incur a Usage Charge for all Ferry Hours required for Flight Segments originating or terminating outside the PSA, regardless of whether Flexjet actually ferries the Aircraft between airports, subject to the SSA exception set forth below in section 5.3(d). Ferry Hours will not reduce Allocated Hours, whether or not Owner incurs a Usage Charge. Owner will be charged 70% of (i) the Usage Charge, or (ii) the Adjusted Exchange Usage Charge (as defined below in section 5.3(c)) if an Exchange Aircraft of a different make and model has been requested by Owner. Instead of paying the Usage Charge for Ferry Hours, Owner may keep the Aircraft outside the PSA for a maximum of five days (including, if applicable, any day or portion thereof used to ferry the Aircraft) if Owner elects to do so when the flight is scheduled. If Owner elects to keep the Aircraft outside the PSA, (i) Owner will for purposes of the Usage Charge be deemed to have used the Aircraft for the greater of (A) three Owner Occupied Hours multiplied by the number of days (including partial days) Owner had possession of the Aircraft, or (B) the number of Owner Occupied Hours used during the entire period Owner had possession of the Aircraft, but Owner's Allocated Hours will only be reduced by the number of Owner Occupied Hours used during this period, and (ii) Owner will be surcharged an amount set forth in Schedule A per crew member, for each night the flight crew remains outside the PSA (the "**Crew Member Expenses**").

(c)     Owner may request an "**Aircraft Upgrade**", for a model larger than the Aircraft, or an "**Aircraft Downgrade**", for a model smaller than the Aircraft. Aircraft Upgrade and Aircraft Downgrade requests are subject to availability except as guaranteed for a "**Low Season Day**" or "**Standard Day**", as set forth in Schedule A. Low Season Days are on days which the demand on aircraft in Flexjet's fractional ownership program is anticipated to be light. A Standard Day is any day other than a Peak Travel Day, a day before or after a Peak Travel Day, or a Low Season Day; however, a Standard Day guarantee may be used on a Low Season Day. Aircraft Upgrades and Aircraft Downgrades are subject to the following restrictions: (i) all Flight Segments must be contiguous; (ii) unused guarantees will not carry over to future Years; (iii) 48 hours Minimum Telephonic Notice (as defined in section 5.5(a)) from Owner; and (iv) no requests or guarantees are permitted for flights departing the SSA. If Owner requests and is provided an Exchange Aircraft of a make or model different from that of the Aircraft, (i) Owner's Allocated Hours will be reduced by the number of Adjusted Exchange Hours used by Owner, (ii) Owner will be charged Owner's (x) Occupied Hourly Rate plus Fuel Component Adjustment, multiplied by (y) the number of Adjusted Exchange Hours used in the Exchange Aircraft (the "**Adjusted Exchange Usage Charge**"), and (iii) nothing in the Dry Lease Exchange Agreement will be construed to prohibit Flexjet from charging Fuel Component Adjustment in addition to the Occupied Hourly Rate on the basis of Adjusted Exchange Hours.

(d)     For flights that originate or terminate in the PSA, Owner may use the Aircraft in the SSA as if that area is part of the PSA with no obligation to pay fees in connection with Ferry Hours, subject to the following restrictions: (i) Minimum Telephonic Notice of 48 hours, subject to customs, immigration and handling restrictions; (ii) 96 hour Minimum Telephonic Notice for flights to or from Central America; (iii) Flexjet is entitled to delay or accelerate requested departure times by up to three hours on a Peak Travel Day; (iv) Flexjet may delay Owner's requested departure from the SSA by up to three hours; and (v) based upon the number of passengers, Flexjet may, in its discretion, select any model aircraft within a comparable cabin category necessary to complete the mission for flights departing the SSA. If Owner schedules a flight from the SSA to have more passengers than passengers actually flown, Flexjet may suspend the SSA exception for the current Year and Owner will incur the Usage Charge for Ferry Hours for the remainder of the Year.

(e)     Owner may travel within the ISA through an arrangement with an international operator, which will maintain operational management and control of the aircraft for the benefit of Owner, subject to Owner providing Flexjet with: (i) Minimum Telephonic Notice of 7 business days plus the region's minimum required call out notice for Owner's initial trip date; (ii) and Owner's express agreement to the International Service Area Provisions (the "**International Travel Program**"). All travel within the ISA is subject to availability and change. Owner acknowledges that Flexjet may discontinue the International Travel Program at any time, subject to Flexjet providing Owner with 30 days' notice.

5.4     Alternative Aircraft. Due to Owner's participation in the Exchange Program, Owner may be provided the use of another aircraft in place of the Aircraft at Flexjet's option. Such other aircraft will be at least reasonably comparable to the Aircraft in size and speed or otherwise identified as an Alternative Aircraft in Schedule A (an "**Alternative Aircraft**"). Flexjet will use reasonable efforts to obtain Owner's aircraft model before providing Owner with an Alternative Aircraft. If an Alternative Aircraft is not available under the Dry Lease Exchange Agreement, Flexjet will provide Owner with use of a Non-Exchange Alternative Aircraft operated by a certified air carrier for Part 135 operations (a "**Non-Exchange Alternative Aircraft**"). If Flexjet provides Owner with a Non-Exchange Alternative Aircraft for more than 5% of the greater of either the (i) Allocated Hours or (ii) Owners Occupied Hours for the Year, Flexjet will credit the hours back to Owner's Allocated Hours for the following Year (excluding the final Year), subject to the restrictions set forth in section 5.1 (the "**Replenishment Hours**"). Owner will be billed for use of an Alternative Aircraft as though the flight occurred in the Aircraft, including fuel stops that are not necessary in the Alternative Aircraft if such fuel stops would have been required in the Aircraft and en route delays that do not occur in the Alternative Aircraft if such en route delays would have occurred in the Aircraft. This section 5.4 will not apply if Owner requests and receives an Aircraft Upgrade pursuant to section 5.3(c).

5.5     Scheduling and Availability.

(a)     Prior to each flight, Owner must provide Flexjet with the required "**Minimum Telephonic Notice**" (as set forth in Schedule A), or as otherwise required under the Program Agreements.

(b)     With respect to the "**Peak Travel Days**" set forth in Schedule B: (i) Owner must provide 48 hour Minimum Telephonic Notice prior to 12:01 a.m. Eastern Time of a Peak Travel Day; (ii) Flexjet will be entitled to delay or accelerate requested departure times by up to three hours; (iii) the rules and charges described in section 5.6 applicable to Owner delays will apply, but each reference to 60 minutes will be deemed to be 30 minutes, (iv) if Owner owns two 3.125% interests and each is in a different aircraft type, Owner may not use the interest in the larger aircraft; and (v) if Owner owns a 3.125% interest in one aircraft type and a larger percentage interest in another aircraft type, Owner shall not use the 3.125% interest.

(c)     For flights that originate or terminate outside of the PSA, Owner must provide Flexjet with: (i) 48 hours Minimum Telephonic Notice on a Low Season Day or Standard Day (including days contiguous to Peak Travel Days); or (ii) 96 hours Minimum Telephonic Notice on a Peak Travel Day.

(d)     Owner will provide Flexjet with the following information for each proposed flight: (i) departure point and destination; (ii) date and time of flight; (iii) number of anticipated passengers; (iv) nature and extent of luggage to be carried; (v) date and time of any return flight; (vi) required documentation (passport, visa, U.S. residency card, etc.); and (vii) any other information that may be pertinent or is reasonably requested by Flexjet.

5.6     Owner Delays, Cancellation.

(a)     Once a departure has been scheduled and the deadline for providing Minimum Telephonic Notice has passed, Owner may request a departure delay of up to 60 minutes, and the request will be honored if the delay will not violate applicable duty time restrictions or other legal or regulatory requirements. Departure time may be delayed for more than 60 minutes only at Flexjet's discretion.

(b)     If Owner is more than 60 minutes late for the scheduled departure time of any Flight Segment (regardless of any requested extension), Flexjet may move the Aircraft and cancel the remainder of the Trip. If the Trip is canceled, Owner will pay the amount described in section 5.6(c) or section 5.6(d), as applicable. If the Trip is not canceled, Owner will pay a Usage Charge for actual Owner Occupied Hours plus additional Flight Time equal to the amount of time Owner is late in excess of 60 minutes.

(c)     Owner may cancel Flight Segments departing within the PSA at no charge upon at least four hours' notice prior to the scheduled departure time. If Owner cancels such Flight Segment less than four hours prior to the scheduled departure time, or if the Flight Segment is canceled pursuant to section 5.6(b), Owner will be charged an amount equal to the Usage Charge that would have been payable if the Flight Segment had been flown, not to exceed three Owner Occupied Hours.

(d)     Owner may cancel Flight Segments departing outside the PSA at no charge upon at least 48 hours' notice prior to the scheduled departure time. If Owner cancels such Flight Segment less than 48 hours prior to the scheduled departure time or if the Flight Segment is canceled pursuant to section 5.6(b), Owner will be charged all crew and aircraft prepositioning expenses incurred by Flexjet, not to exceed the estimated cost of the canceled Trip.

(e)     Allocated Hours will not be reduced as a result of a canceled Flight Segment.

5.7     Flexjet Delays. If Flexjet is more than 60 minutes late furnishing the Aircraft to Owner due to any reason other than Force Majeure, Owner will be granted Allocated Hours equal to the length of the delay, up to a maximum of two hours per occurrence. This will be Owner's sole remedy for Flexjet's delay unless recurrent delays lead to a Flexjet Default, in which case Owner will have the rights set forth in section 12. Flexjet will make reasonable efforts to notify Owner of any expected delays.

5.8     Airports. Owner may use the Aircraft at any time during any day of the week at any airport suitable for departures and arrivals in accordance with applicable FAA Regulations and for which Flexjet can obtain a departure or landing slot, as long as the departure or landing at that airport does not violate the terms of applicable insurance coverage, any Law, or Flexjet's procedures. Flexjet must pre-approve private airfields and may reject them for any reason.

5.9     Multiple Use. The number of aircraft available to Owner for Multiple Use in any 24 hour period is set forth in Schedule A. Any change in Owner's percentage ownership of the Aircraft will automatically change Owner's available Multiple Use, and any additional Multiple Use will be provided on an as available basis, at Flexjet's discretion. For each use of an additional aircraft of the same make and model as its Aircraft, Owner will incur the Usage Charge and the number of Owner Occupied Hours will be deducted from Owner's Allocated Hours. If Owner uses an additional aircraft of a make or model different from its Aircraft, (i) Owner's Allocated Hours will be reduced by the number of Adjusted Exchange Hours used by Owner, and (ii) Owner will be charged the Adjusted Exchange Usage Charge. Owner may use aircraft for any number of Flight Segments if there is point-to-point continuity in the itinerary; however any Flight Segment that is scheduled to conclude more than 12 hours after the first of a series of continuous Flight Segments is subject to availability.

5.10    Allocation of Hours. Unless otherwise requested by Owner when a Flight Segment is booked, if Owner owns or leases fractional interests in other aircraft in Flexjet's fractional ownership program of the same make and model as the Aircraft ("**Same-**

**Model Aircraft"**), Owner's usage of Allocated Hours and Excess Hours under Owner's interests in the Aircraft or Same-Model Aircraft will be allocated and charged to such interests first in order of their descending size and second in order of ascending date of purchase, unless otherwise requested by Owner.

5.11    <u>Delegation of Maintenance and Safety</u>. When aircraft are operated by Flexjet under Part 91, Owner is in operational control of any Program flight and is ultimately responsible for safe operations and compliance with all applicable requirements of the FARs, including those related to airworthiness and operations in connection with the Program flight **("Owner's Responsibilities"**). Owner has delegated to Flexjet the performance of certain tasks associated with carrying out Owner's Responsibilities as set forth in this Agreement, and Owner may rely on Flexjet for aviation expertise and Program management services pursuant to the Program Agreements. Based on this delegation of Owner's Responsibilities, Flexjet and Owner are deemed by the FAA to be jointly and individually responsible for compliance with the FARs. When aircraft are operated by Flexjet under Part 135, Flexjet is deemed to be and is in operational control of all such flights. Notwithstanding anything to the contrary in this Agreement, if Flexjet is conducting operations under Part 91, Flexjet will ensure that the Program conforms to the requirements of Part 91 and no Owner may carry persons or property for compensation or hire on any Flight Segment conducted by Flexjet under the Program.

**6.    LOSS OR DAMAGE TO THE AIRCRAFT**

6.1    <u>Loss or Damage Insurance Proceeds, Alternate Aircraft</u>. In the event of any damage to or loss, theft or destruction of the Aircraft not involving a total loss of the Aircraft, as determined by the insurers that have issued the all-risk hull insurance with respect to the Aircraft (the "**Insurers**"), all applicable aircraft hull insurance proceeds will be paid to Flexjet in trust for the repair and restoration of the Aircraft, and Flexjet will use its good faith efforts to provide Owner with an Alternative Aircraft while the Aircraft is being repaired.

6.2    <u>Replacement Aircraft</u>. In the event of a total loss of the Aircraft, as determined by the Insurers (a "**Total Loss**"), Flexjet will have the option to substitute for the Aircraft an aircraft of the same make and model with a fair market value at least equal to that of the Aircraft immediately preceding the Total Loss (a "**Replacement Aircraft**"). Flexjet may exercise this option by notice to Owner within thirty (30) days after confirmation of a Total Loss. If Flexjet elects to provide a Replacement Aircraft, the Replacement Aircraft will become the Aircraft and all Program Agreements will remain in effect pursuant to their respective terms. Flexjet may use insurance proceeds to purchase the Replacement Aircraft, but any excess insurance proceeds will be shared among the Owners according to their Proportionate Shares. If the insurance proceeds are insufficient to purchase a Replacement Aircraft, Flexjet will fund the difference. If Flexjet elects not to provide a Replacement Aircraft, Owner will be entitled to receive its Proportionate Share of the applicable insurance proceeds, the Interest will cease to exist, and this Agreement and the other Program Agreements will terminate, except to the extent expressly set forth herein or therein. Owner and Flexjet agree to execute all documents necessary to accomplish the foregoing.

**7.    NO LIENS, CLAIMS, CHARGES OR ENCUMBRANCES.** During the Term, neither party will cause or permit any Lien attributable to it to attach to the Interest, other than (a) mechanic's liens to be discharged in the ordinary course of business, (b) the rights of Owners pursuant to the Owners Agreement and (c) in the case of Owner, a lien as permitted under the Owners Agreement. If Owner is a legal entity and places a lien on the Interest under the Owners Agreement, Flexjet may require a third party guarantee in form and substance acceptable to Flexjet for all charges incurred under this Agreement.

**8.    FORCE MAJEURE.** Flexjet will have no liability for delay or failure to furnish any service contemplated by this Agreement if such delay or failure is caused by a Force Majeure event. For the avoidance of doubt, a Force Majeure event will have occurred if, in the reasonable view of Owner, Flexjet, or any pilot of the Aircraft, safety may be compromised, in which case Owner, Flexjet or any pilot of the Aircraft may terminate a Flight Segment, refuse to commence a Flight Segment, or take other action necessitated by safety considerations without liability for loss, injury, damage or delay.

**9.    EVENTS OF DEFAULT BY OWNER.** The occurrence and continuation of any of the following is an "**Owner Default**:" (a) Owner fails to pay any amount required to be paid by Owner under this Agreement or under any other agreement with Flexjet or its affiliates, and does not cure this non-payment within 30 days after the date that payment is due; (b) any Lien, other than a Lien permitted under the Owners Agreement, attaches to the Aircraft or the Interest as a result of Owner's act or failure to act and continues for 10 days after Owner's receipt of written notice from Flexjet; (c) Owner breaches any other material provision of this Agreement or any other agreement with Flexjet, and does not cure this breach within 30 days, or other time period agreed to by Owner and Flexjet, after receipt of written notice from Flexjet; (d) Owner uses any Program Aircraft for illegal or illicit purposes; or (e) Owner (i) makes an assignment for the benefit of its creditors; (ii) consents to, or fails for 30 days to stay the appointment of, a custodian for itself or substantially all of its property; (iii) is adjudicated bankrupt or has an order for relief granted upon a petition in bankruptcy or other Law relating to the relief of debtors; or (iv) files a petition or answer seeking liquidation, reorganization or other substantial relief under any bankruptcy or other Law for the relief of debtors, or files an answer failing to deny the material allegations of a petition filed against it for any such relief.

**10.    REMEDIES FOR DEFAULT BY OWNER.** For as long as an Owner Default continues, Owner must continue to pay the MMF (and Lease Payment if under a Lease Agreement) however, Owner will have no right to use the Aircraft or any other aircraft under the Program Agreements, or receive management services under any Program Agreement, and Owner's Allocated Hours will be reduced by an amount equal to $1/12^{th}$ of the Year's Allocated Hours for each 30 day period (or part thereof) that the Owner Default continues.

Any such reduction of Owner's Allocated Hours will be in addition to Flexjet's right to pursue all other remedies available to it at law or in equity.

11.     **EVENTS OF DEFAULT BY FLEXJET.** The occurrence and continuation of any of the following is a "**Flexjet Default**": (a) Flexjet fails to maintain the insurance required by this Agreement in full force and effect during the Term; (b) Flexjet furnishes an aircraft to Owner more than 60 minutes late on five or more separate occasions during any Year in connection with the same fractional interest under circumstances that entitle Owner to additional flight time pursuant to section 5.7; subject to Owner providing notice of the Flexjet Default within 60 days after the end of such Year; (c) Flexjet breaches any other material provision of this Agreement or any other agreement with Owner, and does not cure this breach within 30 days, or other time period agreed to by Owner and Flexjet, after receipt of written notice from Owner; (d) Flexjet (i) makes an assignment for the benefit of its creditors; (ii) consents to, or fails for 30 days to stay the appointment of, a custodian for itself or substantially all of its property; (iii) is adjudicated bankrupt or has an order for relief granted upon a petition in bankruptcy or other Law relating to the relief of debtors; or (iv) files a petition or answer seeking liquidation, reorganization or other substantial relief under any bankruptcy or other Law for the relief of debtors, or files an answer failing to deny the material allegations of a petition filed against it for any such relief; or (e) in any Year, aircraft operated by Flexjet are involved in more than three accidents that result in Accident Suspensions, or during the Term, flight crew members of aircraft operated by Flexjet are involved in more than four Accident Suspensions.

12.     **REMEDIES FOR DEFAULT BY FLEXJET.** In addition to any other remedies provided by this Agreement or otherwise available to Owner at law or in equity, if a Flexjet Default occurs, Owner may by notice to Flexjet terminate this Agreement and require Flexjet to repurchase the Interest in accordance with the Purchase Agreement, or terminate the leasehold interest in accordance with the Lease Agreement.

13.     **THIRD PARTY BENEFICIARIES.** Owner acknowledges that, in consideration of the mutual covenants set forth in this Agreement and the other Program Agreements, the other Owners are third party beneficiaries of this Agreement.

14.     **REPRESENTATIONS AND WARRANTIES OF FLEXJET.** Flexjet represents and warrants to Owner that: (a) Flexjet is validly organized and existing in good standing under the laws of the state of Delaware, and Flexjet has the power and authority to enter into this Agreement and to execute, deliver and receive all other instruments and documents executed, delivered, and received in connection with the transactions contemplated hereby; (b) there is no action, suit or proceeding pending against Flexjet before any Governmental Authority that challenges the validity of or seeks to bar Flexjet from performing its obligations under the Program Agreements; (c) the execution and delivery of the Program Agreements by Flexjet and the performance of its obligations thereunder do not violate or conflict with any provision of Flexjet's governing instruments or any Law; (d) the Program Agreements are valid and binding obligations of Flexjet, enforceable in accordance with their terms, except as such enforceability may be affected by Laws of general application affecting creditors' rights, or by judicial discretion, to which equitable remedies are subject; and (e) Flexjet is not subject to any restriction that prohibits, would be violated by, or would be in conflict with, the execution, delivery or performance of the Program Agreements and the transactions contemplated thereby.

15.     **REPRESENTATIONS AND WARRANTIES OF OWNER.** Owner represents and warrants to Flexjet that: (a) Owner, if an entity, is duly organized and existing in good standing under the laws of the state of its organization; (b) Owner has the power and the authority to enter into the Program Agreements and to carry out the transactions contemplated thereunder; (c) the execution and delivery of the Program Agreements by Owner and the performance of its obligations thereunder have been duly authorized by all necessary action of Owner and do not violate or conflict with any provision of Owner's governing instruments (if Owner is an entity) or any Law; (d) there is no action, suit or proceeding pending or threatened against Owner before any Governmental Authority that challenges the validity of or seeks to bar Owner from performing its obligations under the Program Agreements; and (e) the Program Agreements are the valid and binding obligations of Owner enforceable in accordance with their terms, except as such enforceability may be affected by Laws of general application affecting creditors' rights, or by judicial discretion, to which equitable remedies are subject.

*[Signature Page Follows]*

The parties have executed this Management Agreement on the date stated under Flexjet, LLC's signature. This Management Agreement may be executed by ink or facsimile signature in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one agreement.

**OWNER: Baseball Transport, LLC**

By _____
        A274D5A5ABFD4A7...

Printed Name: G. Nenninger

Title (if applicable): _____

**FLEXJET, LLC**

By _____
        F48C711C8DAB460...

Printed Name: Mike Metera

Title: VP, Admin & Contracts

Date: 5/1/2019

**SCHEDULE A**
**TO THE MANAGEMENT AGREEMENT**

| | | |
|---|---|---|
| Aircraft Model: | Phenom 300 | |
| Serial Number: | 50500233 | |
| FAA Registration: | N360FX | |
| Interest Percentage: | 9.375% | |
| Monthly Management Fee: | $13,073.00 | per month (*see* section 4.1) (subject to Annual Adjustment Percentage of **2%**)* |
| Liability Insurance: | $300,000,000.00 | combined single limit liability coverage (*see* section 3.6) |
| EU Trip Charge | $1,094.00 | per trip to the European Union (see section 3.6) (subject to change due to any changes in insurance premiums) |
| Occupied Hourly Rate: | $2,095.00 | per Owner Occupied Hour (see section 4.2) (subject to Annual Adjustment Percentage of **2%**)* |
| Occupied Hourly Rate Deposit: | $19,181.00 | (see section 4.3) |
| Base Fuel Price: | $1.80 | per gallon |
| Fuel Component Adjustment: | $974.00 | per Owner Occupied Hour as of May 1, 2019 (as defined below) |
| Minimum Telephonic Notice: | 10 | hours (except as otherwise provided in this Agreement) |
| Allocated Hours: | 75 | hours per Year (see section 5.1(a)) |
| Excess Hours: | 18.75 | hours per Year (see section 5.1(a)) |
| Annual Available Hours: | 93.75 | hours per Year (see section 5.1(a)) |
| Alternative Aircraft: | | Other aircraft which are reasonably comparable to the Aircraft in size and speed, or which are larger and/or faster (see section 5.4) |
| Short Leg Exclusions: | 3 | per Year (*see* section 5.3(a)) |
| VP Hour Contribution Limit: | 18 | hours per Year (*see* section 5.2(a)) |
| Crew Member Expenses: | $576 | per crew member (*see* section 5.3(b)) (subject to Annual Adjustment Percentage of **2%**)* |

*Adjustment - Subject to adjustment as described in section 4.4 of this Agreement.

## SCHEDULE A (continued)

<u>Multiple Use</u>

The number of aircraft permitted to be used for Multiple Use (*see* section 5.9) in a period of 24 hours is set forth in the chart below. Multiple Use of aircraft is subject to the following: (i) availability, (ii) 48 hours Minimum Telephonic Notice, (iii) Flexjet's consent for use of additional aircraft originating or terminating outside the PSA, (iv) Flexjet may delay or accelerate the requested departure time by three hours for use of any additional aircraft, (v) Owner is not entitled to Replenishment Hours for the Multiple Use of more than two aircraft in any 24 hour period, (vi) Owner is limited to the use of no more than 5 aircraft in any 24 hour period, regardless of the number of Interests owned, (vii) If using VP Hours, a maximum of two aircraft may be used with only one aircraft using the VP Hours, and (viii) Owner may select the model of aircraft, of which Owner owns an interest, for the first Flight Segment, and Flexjet will determine, at its discretion, the model of aircraft to be provided for the second, and subsequent, Flight Segments, subject to any applicable Adjusted Exchange Usage Charge and Owner's Allocated Hours will be reduced by the number of Adjusted Exchange Hours used by Owner.

| Cumulative Ownership | Uses per Year | # of Aircraft | Peak Travel Days** | Aircraft Upgrades/Downgrades*** |
|---|---|---|---|---|
| Under 12.5% | 2 | 2 | None | None |
| 12.5% to less than 18.75% | Unlimited | 2 | None | None |
| 18.75% to less than 25% | Unlimited | 2 | Available | None |
| 25% to less than 37.5% | Unlimited | 3 | Available | 2 |
| 37.5% to less than 75% | Unlimited | 4 | Available | 2 |
| 75% to 100% | Unlimited | 5 | Available | 2 |

** Refers to a Peak Travel Day and any day contiguous to a Peak Travel Day.

*** The permitted Multiple Use of two aircraft within a period of 24 hours (for Cumulative Ownership greater than 25%) when Owner requests and is provided with an Aircraft Upgrade or Aircraft Downgrade is not available on Peak Travel Days.

<u>Guaranteed Upgrades/Downgrades</u>

Low Season Day guarantee       <u>1</u>   per Year

Standard Day guarantee       <u>1</u>   per Year

<u>Fuel Component Adjustment</u>

The Fuel Component Adjustment varies monthly according to the average price of Jet-A Fuel as issued by Argus Aviation Research Group/U.S., Inc., the company that provides the fuel rates published by Business and Commercial Aviation, for Flexjet, LLC ("**BCA Price**"). Because Flexjet purchases bulk fuel, Flexjet also provides a discount ("**Bulk Fuel Discount**"). The Fuel Component Adjustment is calculated each month as follows: (BCA Price - Bulk Fuel Discount - $1.80) x Fuel Adjustment Factor. For purposes hereof, the "**Fuel Adjustment Factor**" as of the date hereof, for the following types of aircraft shall be:

| Aircraft | Fuel Adjustment Factor |
|---|---|
| Phenom 300 | 298 |
| Lear 75 | 359 |
| Legacy 450/500 | 453 |
| Challenger 300/350 | 509 |
| Gulfstream 450 | 807 |

The Fuel Adjustment Factor may be adjusted from time to time as determined in Flexjet's reasonable discretion, in response to developments beyond Flexjet's control subsequent to the date hereof.

**SCHEDULE B**
**TO THE MANAGEMENT AGREEMENT**

**PEAK TRAVEL DAYS**

The following is the current listing of Peak Travel Days (*see* section 5.5(b)).  Any changes or additions to the following list will be published and distributed by Flexjet with notice to all Owners.  There will be no more than 10 Peak Travel Days during any calendar year.

**2019**

| | | |
|---|---|---|
| Tuesday | January 1 | New Year's Day |
| Wednesday | January 2 | Day after New Year's Day |
| Friday | February 15 | Friday before Presidents Day |
| Monday | February 18 | Presidents Day |
| Tuesday | February 19 | Day after Presidents Day |
| Wednesday | November 27 | Day before Thanksgiving Day |
| Sunday | December 1 | Sunday after Thanksgiving |
| Monday | December 2 | Monday after Thanksgiving |
| Thursday | December 26 | Day after Christmas |
| Friday | December 27 | Friday after Christmas |

DocuSign Envelope ID: 6F05377A-86E9-47AD-AF52-11D0G22BFF

**ATTACHMENT A**
**TO THE MANAGEMENT AGREEMENT**

**Operational Control Acknowledgement**

1. Owner is in operational control of a Flexjet program flight when Owner-

    i.   Has the rights and is subject to the limitations set forth in 14 C.F.R. §§ 91.1003 through 91.1013;
    ii.  Has directed that a program aircraft carry passengers or property; and
    iii. The aircraft is carrying those passengers or property.

2. Owner is not in operational control of a flight in the following circumstances:

    i.   The aircraft is used for a flight for administrative purposes such as demonstration, positioning, ferrying, maintenance, or crew training, and no passengers or property designated by Owner are being carried; or
    ii.  The aircraft is being operated under Part 121 or 135 of the Federal Aviation Regulations.

3. Owner acknowledges and agrees that it is in operational control when using a program aircraft and the flight is conducted under Part 91 of the Federal Aviation Regulations.  When Owner is in operational control its responsibilities will include:

    i.   Responsibility for compliance with the management specifications and all applicable regulations;
    ii.  Enforcement actions for any noncompliance; and
    iii. Liability risk in the event of a flight-related occurrence that causes personal injury or property damage.

4. If Owner has delegated some or all of the tasks associated with operational control to Flexjet, and relies upon Flexjet's aviation expertise as the program manager to fulfill the program management services, Owner and Flexjet are jointly and individually responsible for compliance.

**ACKNOWLEDGED AND AGREED TO:**

**OWNER:** Bassbery Transport, LLC

By _____
        A274D5A5ABFD4A7...

Printed Name:  G. Nenninger _____

Title (if applicable):  _____

Date:  May 1, 2019 _____

**ATTACHMENT B**
**TO THE MANAGEMENT AGREEMENT**

**AUTHORIZATION AGREEMENT FOR ELECTRONIC FUNDS TRANSFER (EFT)**

**Owner Information:**

Account Name: _____

Federal ID Number: _____

**Depository Financial Institution Information:**

Name: _____      Branch: _____

City: _____      State: _____   Zip Code: _____

Routing Number: _____

Account Number: _____

Type of Account (*check one*):    __ Checking Account      __ Savings Account

**Monthly Deduction Amount – Select One Option**

   __ Option 1 - Amount of Monthly Deduction: $ _____

   __ Option 2 - Total Monthly Invoice Amount

**Authorization:**

I hereby authorize **Flexjet, LLC**, to initiate debit entries to my bank account(s), at the depository financial institution, in the amounts specified, as listed above. The monthly deduction will occur on the due date of the invoice. This authorization is to remain in full force and effect until such time as the Program Agreements are terminated in accordance with the terms thereof. I acknowledge that the origination of EFT transactions to my account must comply with the provisions of U.S. Law.

This written debit authorization shall permit Flexjet, LLC to change the monthly authorized deduction at such time as there is a change to the management fee based on the provisions set forth in the Program Agreements.

Signature: _____      Date: _____

Print Name: _____

**Return Completed Form to:**

  **Flexjet, LLC**
  Attn: Contract Department
  26180 Curtiss Wright Parkway
  Cleveland, Ohio 44143



# DRY LEASE EXCHANGE AGREEMENT

**THIS DRY LEASE EXCHANGE AGREEMENT** (this "**Agreement**") is between **FLEXJET, LLC,** a Delaware limited liability company ("**Flexjet**"), and each owner or lessee of an interest in a Flexjet Program Aircraft (collectively referred to as the "**Participants**" and individually as a "**Participant**"). Each Participant owns an interest, or leases an undivided property interest in the aircraft set forth next to Participant's name in Schedule A to this Agreement, and desires to share its aircraft with other Participants and to use Exchange Aircraft in an Exchange Program. Each Participant has also retained Flexjet to manage its interest under the terms of a management agreement. Capitalized terms that are not defined in this Agreement have the meanings ascribed to them in the General Terms and Conditions Agreement.

The parties therefore agree as follows:

**1.     TERM.** The term of this Agreement commences upon the date when a Participant acquires an Interest in a Flexjet Program Aircraft and continues in effect for so long as Participant continues to own or lease an interest and Flexjet manages such interest. If an interest is assigned, the lease of an interest terminates, or if additional Participants join the Exchange Program, Flexjet will amend Schedule A to reflect the changes. Flexjet may add to or remove from the Exchange Program any Aircraft that is wholly-owned by Flexjet or that is leased to Flexjet. Due to constant changes in the dry lease exchange pool for both Flexjet and Affiliates, the list of dry-lease aircraft is maintained at the office of One Sky Flight, LLC and is available upon request.

**2.     PARTICIPATION IN EXCHANGE PROGRAM.**

2.1     Each Participant agrees to participate in the Exchange Program and share its Aircraft with all other Participants in good standing under this Agreement. Any Participant using the Aircraft, or an Exchange Aircraft, under Part 91 is in operational control of such aircraft, unless Participant opts to have flights conducted under Part 135, where Flexjet will have operational control of the aircraft. Flexjet will administer the Exchange Program at its expense.

2.2     If an aircraft in which a Participant holds an interest is unavailable for use by its Participant, the Participant is entitled to use an Exchange Aircraft on an equal-time, as-available, first-come, first-served basis, subject to the limitations of the management agreement relating to such Participant. Participant may use an Exchange Aircraft of the same make and model as its Aircraft at no additional charge beyond its Usage Charge. If Participant requests an Exchange Aircraft of a make or model different from its Aircraft, (i) Participant's Allocated Hours will be reduced by the number of Adjusted Exchange Hours used by Participant, and (ii) Participant will be charged the Adjusted Exchange Usage Charge.

2.3     The Differential Cost Factors will be established by Flexjet as if the Exchange Program were governed by FAR 91.501(c)(2). The Differential Cost Factors presently established for the Exchange Aircraft are set forth in Schedule B of this Agreement. Flexjet will revise Schedule B as new makes or models of aircraft are added to the Exchange Program and will deliver a current copy of Schedule B to Participants upon request.

2.4     If a Participant requests an Aircraft Upgrade with a Differential Cost Factor higher than the Differential Cost Factor for Participant's Aircraft, the number of Owner Occupied Hours for which the Participant may use such an Exchange Aircraft per Year may not exceed 15% of the Participant's Allocated Hours. This limit does not apply to Aircraft Downgrades to less costly Exchange Aircraft specifically requested by Participant.

**3.     MAINTENANCE.** No inspection or necessary periodic or preventive maintenance will be delayed or postponed for the purpose of scheduling any aircraft under the Exchange Program. Each Participant further acknowledges that each Exchange Aircraft has been placed on the Part 135 Operations Specifications for Flexjet, and that each Exchange Aircraft shall be maintained in accordance with one of Flexjet's FAA approved continuing airworthiness maintenance programs.

**4.     OPERATION OF AIRCRAFT.** Flexjet will engage and provide to each Participant qualified pilots as described in each Participant's Management Agreement for each flight undertaken under this Agreement. Participants may also provide their own pilots. Pilots provided by a Participant or at a Participant's direction are subject to Flexjet's approval. If, in the view of the pilots of the Aircraft, safety may be compromised, the pilots may terminate a flight, refuse to commence a flight, or take other action required by safety considerations without liability for loss or delay except for negligence or misconduct. No Participant will be liable to any other Participant for delay in furnishing or failure to furnish the Aircraft or pilots.

**5.     REPRESENTATIONS AND WARRANTIES.** Each Participant represents and warrants to Flexjet, the other Participants and all owners and lessees of Exchange Aircraft that: (a) Participant will use Exchange Aircraft only for and on account of Participant's own pleasure or business and will not use any Exchange Aircraft for any illegal purpose or to transport passengers or cargo in air commerce for compensation or hire except in accordance with the provisions of the FARs and in a manner approved by Flexjet; (b) Participant will comply with all Laws and airport orders, rules, and regulations affecting Exchange Aircraft operations, use, or occupancy, or use of airport premises; (c) Participant will not, except as permitted by its Program Agreements, (i) attempt to assign any interest in the Exchange Aircraft, or (ii) take any action to attach to any interest in the Exchange Aircraft any Lien not explicitly permitted under the

Program Agreements; and (d) Participant has contracted with Flexjet to obtain insurance such that all aircraft in the Exchange Program have casualty and liability insurance not less than that specified in Flexjet's customary form of Management Agreement.

**6.    DEFAULTS.** Participant may not use any Exchange Aircraft for such period of time as Participant, due to its event of default under the Program Agreements, is not permitted to use any aircraft under the Program Agreements.

**7.    WAIVER OF SUBROGATION.** Participants, jointly and severally, and Flexjet hereby waive all claims and causes of action each or any of them may have against any other of them, or any of their respective employees, agents, officers, directors, successors, assigns, members, managers or lessees, or any guest, invitee or other permitted user of any aircraft in the Exchange Program, for claims, losses or damages covered by the insurance which Flexjet is required to maintain on the Aircraft pursuant to the Program Agreements. Such insurance shall permit this waiver of subrogation.

**8.    AMENDMENT.** This Agreement may be amended by written action of all the parties hereto. Flexjet may by notice to the Participants amend this Agreement in any manner that serves the purposes of this Agreement and is not materially adverse to any Participant without that Participant's written consent. Any such amendment will take effect 60 days after notice to the Participants, unless a majority in interest of the Participants reject the amendment by notice to Flexjet. The Participants will not unreasonably disapprove any proposed amendment.

**9.    TRUTH-IN-LEASING.** In accordance with FAR Section 91.23, it is stated as follows:

9.1    EACH PARTICIPANT'S AIRCRAFT HAS BEEN INSPECTED AND MAINTAINED WITHIN THE 12 MONTH PERIOD PRECEDING THE DATE OF THIS DRY LEASE EXCHANGE AGREEMENT, OR SUCH SHORTER PERIOD TO THE EXTENT THE AIRCRAFT IS LESS THAN 12 MONTHS OLD IN ACCORDANCE WITH THE PROVISIONS OF FAR PARTS 91 AND 135 AND ALL PARTIES TO THIS DRY LEASE EXCHANGE AGREEMENT CERTIFY THAT THE APPLICABLE REQUIREMENTS FOR MAINTENANCE AND INSPECTION HAVE BEEN COMPLIED WITH.

9.2    EACH PARTICIPANT AGREES, CERTIFIES AND KNOWINGLY ACKNOWLEDGES THAT WHEN THEY OPERATE ANY AIRCRAFT UNDER THIS AGREEMENT, THEY WILL BE KNOWN AS, CONSIDERED, AND IN FACT WILL BE THE OPERATOR OF THE AIRCRAFT AS PROVIDED IN THIS DRY LEASE EXCHANGE AGREEMENT AND UNDER THE FARS.

9.3    AN EXPLANATION OF FACTORS BEARING ON OPERATIONAL CONTROL AND PERTINENT FARS CAN BE OBTAINED FROM THE NEAREST FAA FLIGHT STANDARDS DISTRICT OFFICE.  EACH PARTY ACKNOWLEDGES THAT THEY UNDERSTAND AND AGREE TO ABIDE BY THESE REGULATIONS. THE PARTIES CERTIFY THAT A TRUE COPY OF THIS AGREEMENT WILL BE CARRIED ON THE AIRCRAFT AT ALL TIMES, AND WILL BE MADE AVAILABLE FOR INSPECTION UPON REQUEST BY AN APPROPRIATELY CONSTITUTED IDENTIFIED REPRESENTATIVE OF THE ADMINISTRATOR OF THE FAA.

The parties have executed this Dry Lease Exchange Agreement on the date stated under Flexjet, LLC's signature. This Dry Lease Exchange Agreement may be executed by ink, facsimile, or other electronic signature in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one agreement.

**PARTICIPANT:** Sklar Transport, LLC

By _____
A274D5A5ABFD4A7...

Printed Name: G. Nenninger

Title (if applicable): _____

**FLEXJET, LLC:**

By _____
F48C711C8DAB460...

Printed Name: Mike Metera

Title: VP, Admin & Contracts

Date: 5/1/2019

DocuSign Envelope ID: 6EC637A7-846B-47AD-AF59-17D632BFFF11

**SCHEDULE A**
**TO THE DRY LEASE EXCHANGE AGREEMENT**

| Participant's Name: | Interest: | Aircraft of Participant: |
|---|---|---|
| **Sklar Transport, LLC** | 9.375% | Aircraft Model: Phenom 300<br>Serial Number:  50500233<br>FAA Registration:  N360FX |

DocuSign Envelope ID: 6E25377A-86E7-47AD-AF59-17D0622BFFFF

**SCHEDULE B**
**TO THE DRY LEASE EXCHANGE AGREEMENT**

**For Phenom 300**

|  | Differential Cost Factors | P300 | L45LXi / 75LXi | L450 / 500 | CL300 / 350 | *G450 |
|---|---|---|---|---|---|---|
| Read | P300 | **1.00** | 1.35 | 1.70 | 2.00 | 2.80 |
| across | L45LXi / 75LXi | 0.90 | **1.00** | 1.55 | 1.75 | 2.40 |
| table. | L450 / 500 | 0.85 | 0.95 | **1.00** | 1.50 | 2.10 |
|  | CL300 / 350 | 0.70 | 0.80 | 0.95 | **1.00** | 1.80 |
|  | G450 | 0.55 | 0.60 | 0.70 | 0.85 | **1.00** |

\*    Indicates that the aircraft is not eligible for requested Aircraft Upgrades/Aircraft Downgrades prior to reaching a fleet size sufficient to administer the additional demand of Aircraft Upgrades/Downgrades. (Read across table for Factor applied to Upgrade / Downgrade)

\*\*  Flexjet has established the Differential Cost Factors for the various Exchange Aircraft. Flexjet reserves the right in its sole discretion to amend the Differential Cost Factors upon thirty (30) days' prior notice to the Participants in the event there is a material change in the differential costs of operating, owning, or maintaining the various Exchange Aircraft.

DocuSign Envelope ID: 6E7577A7-A6E7-7AD4-8F93-11F0DB22BFF5

26180 Curtis Wright Parkway
Cleveland, Ohio 44143
TEL  216-261-3500
FAX 216-750-8790



**Sklar Transport, LLC**
5395 Pearl Parkway, Suite 200 ,
Boulder, CO  80301

RE:  Sideletter Agreement - 9.375% Phenom 300 - N360FX

Dear Mr. Nenninger,

This letter ("**Sideletter Agreement**") is designated by the undersigned parties as a Program Agreement as set forth in the General Terms and Conditions Agreement made between **Flexjet, LLC** a Delaware limited liability company, 26180 Curtiss Wright Parkway, Cleveland, Ohio 44143 ("**Flexjet**"), **Flight Options, LLC** a Delaware limited liability company, 26180 Curtiss Wright Parkway, Cleveland, Ohio 44143 and **Sklar Transport, LLC**, 5395 Pearl Parkway, Suite 200 , Boulder, CO  80301 ("**Owner**"), and includes additional agreements and understandings or modifies certain terms and conditions of the Program Agreements, which are incorporated by reference.  To the extent that a provision set forth in this Sideletter Agreement is in conflict with any provision of a Program Agreement, the applicable provision of this Sideletter Agreement shall control.  Terms and conditions of the Program Agreements not expressly amended by this Sideletter Agreement remain in full force and effect. Capitalized terms that are not defined in this Agreement have the meanings ascribed to them in the General Terms and Conditions Agreement.

**Headings**
The headings in this Sideletter Agreement are for reference only and shall not affect the interpretation of this Sideletter Agreement.

**Management of the Phenom 300 Interest – Flight Options, LLC**
Notwithstanding anything to the contrary in any of the Program Agreements, Flexjet and Owner agree that for all flights on which Owner elects to utilize the Phenom 300 Interest (as described in the Program Agreements), Flexjet has delegated responsibility for the management of the Phenom 300 Interest to Flight Options, LLC ("Flight Options"), an "Affiliate of Manager" (as defined in Part 91), and Flight Options agrees to manage the Phenom 300 Interest for the benefit of Owner under the terms and conditions set forth under the Program Agreements; provided, however, that Flexjet and Flight Options shall be jointly and severally liable for Flight Options acts and omissions under the Program Agreements. Additionally, Owner acknowledges and agrees that if, at any time during the Original Term, the Phenom 300 Interest has been listed on a Part 135 Certificate held by Flexjet, Flexjet will assume full responsibility for the management of the Phenom 300 Interest, as set forth under the Management Agreement.

**Extra Annual Hours**
Flexjet and Owner acknowledge that Schedule A of the Management Agreement sets forth Owner's Allocated Hours. In addition to the Allocated Hours, Owner will be entitled to an additional **5** hours per Year ("**Extra Annual Hours**"). Usage of the Extra Annual Hours will be computed using the same method used for Owner's Allocated Hours, which is set forth in section 5.3(a) of the Management Agreement.  Extra Annual Hours will be utilized and accrued in the same manner as Allocated Hours. When using the Extra Annual Hours, Owner will pay Owner's Usage Charge plus applicable taxes.  Unused Extra Annual Hours shall carry over to the following Years and will be included in the calculation of Unused Allocated Hours pursuant to section 5.1(c) of the Management Agreement.  Under no circumstances shall Owner be entitled to fly more than the Annual Available Hours (as defined in section 5.1(a) of the Management Agreement) in any given Year during the Original Term. If at this Management Agreement's termination, Owner has exceeded the accrued Allocated Hours and accrued Extra Annual Hours to which it is entitled as of the termination date, then Owner must pay a pro rata charge to Flexjet (as set forth in section 5.1(b) of the Management Agreement).

DocuSign Envelope ID: 6E2537A7A86ED7AD-A752-11D0G22BFF5

Flexjet and Owner agree that during the course of the Original Term, Owner is entitled to purchase VP Hours. Flexjet agrees that if Owner purchases VP Hours in any given contract Year, Flexjet will automatically increase Owner's Annual Available Hours up to 150% of Owner's Allocated Hours for that Year for the purpose of flying Owner's purchased VP Hours. If Owner purchases VP Hours and such hours are not completely flown by the current Year expiration, Owner is entitled to an increase in their Annual Available Hours for the Year following purchase sufficient to fly such VP Hours, but not to exceed 150% of Owner's Allocated Hours. Owner acknowledges and agrees that pursuant to section 5.2 of the Management Agreement, the purchase and sale of VP Hours will count toward Owner's Annual Available Hours.

**Cumulative Ownership Monthly Management Fee**

Notwithstanding anything to the contrary in any of the Program Agreements, Flexjet and Owner agree that in the event Owner's Cumulative Ownership in the Flexjet Program decreases below 9.375%, the MMF for this Interest will be automatically adjusted based upon a rate of $11,004.00 per 6.25% interest owned (or prorated portion) as escalated according to the Annual Adjustment from the date of Closing. Such adjusted rate shall continue to be subject to the Annual Adjustment as provided for in section 4.4 of the Management Agreement for the remainder of the Original Term, subject to any further reductions in Cumulative Ownership.

**Confidentiality**

Owner agrees that it must not, without the prior written consent of Flexjet, divulge any of the terms of this Sideletter Agreement or any addendum to the Program Agreements. Upon notice to Flexjet, Owner may divulge such information to the extent required by law or legal process.

*[Signature page follows]*

The parties have executed this Sideletter Agreement on the date stated under Flexjet, LLC's signature. This Sideletter Agreement may be executed by ink or facsimile signature in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one agreement.

**OWNER:** Basisschool Transport, LLC

By _____
   A274D5A5ABFD4A7...

Printed Name: G. Nenninger

Title (if applicable): _____


**FLIGHT OPTIONS, LLC**

By _____
   F48C711C8DAB460...

Printed Name: Mike Metera

Title: VP, Admin & Contracts

Date: 5/1/2019


**FLEXJET, LLC:**

By _____
   F48C711C8DAB460...

Printed Name: Mike Metera

Title: VP, Admin & Contracts

Date: 5/1/2019

flexjet

**Authorized Schedulers Form**

Contract Name:   Sklar Transport, LLC

Principal Name:   Geoffrey Nenninger

Address:              5395 Pearl Parkway, Suite 200 , Boulder, CO  80301

Phone:   <u>(720) 836-1083</u>

Cell:      <u>(303) 931-6461</u>

Fax:

Email:   <u>gnenninger@sklarexploration.com</u>

Date of Birth: _____

Additional Authorized Scheduler Name: _____

Street Address: _____

City: _____   State: _____   Zip: _____

Phone: _____   Fax: _____   Cell: _____

Email: _____

Additional Authorized Scheduler Name: _____

Street Address: _____

City: _____   State: _____   Zip: _____

Phone: _____   Fax: _____   Cell: _____

Email: _____

Additional Authorized Scheduler Name: _____

Street Address: _____

City: _____   State: _____   Zip: _____

Phone: _____   Fax: _____   Cell: _____

Email: _____

Please sign to verify that the individuals listed above are authorized to schedule aircraft.

Authorized Signatures: _____

Title: _____

Print Name: G. Nenninger _____   Date: May 1, 2019

# OWNER REFERRAL PROGRAM

**Referring Owner: Geoffrey Nenninger**

Thank you for choosing Flexjet to manage your private travel. We look forward to continuing our relationship and, for first-time Owners, beginning to know you and your travel preferences in order to maintain the highest levels of service on every flight.

As you become acquainted with the Flexjet approach to fractional ownership, we hope you will consider sharing your experience with friends and colleagues. Over the years, a significant part of our new business has come from referrals. That's why we created a program that incentivizes Owners to tell friends and colleagues about Flexjet. We understand that an endorsement from someone you trust carries substantial weight when considering a provider. We've heard from Owners time and time again that a referral was one of the major factors they considered when selecting Flexjet.

We've always been committed to easing the transition to a new private aircraft provider, which is why we're offering an incentive for new Owners who come to Flexjet through a referral:

| REFERRAL LEVEL | CREDIT* |
|---|---|
| OWNERSHIP | $10,000 |
| LEASE | $7,500 |
| JET CARD | $5,000 |

**REFERRAL INCENTIVE OPTIONS***

- Apply the credit to your account
- Transfer the credit to the person you referred
- Donate the credit to a charity of your choice

To submit a referral, simply fill out the information of the person below and we'll get in touch:

NAME: _____

ADDRESS: _____

PHONE: _____

EMAIL: _____

REFERRALS@FLEXJET.COM

800.FLEXJET

FLEXJET LLC, 26180 CURTISS WRIGHT PARKWAY, CLEVELAND OH 44143

*Program benefits subject to change at any time.