# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF COLORADO

| In re:<br><br>SKLAR EXPLORATION COMPANY, LLC,<br>EIN:  72-1417930<br><br>   Debtor. | Case No. 20-12377-MER<br><br>Chapter 11<br><br>   (Jointly Administered) |
|---|---|
| SKLARCO LLC,<br>EIN:  72-1425432<br><br>   Debtor. | Case No. 20-12380-MER |

## REORGANIZED DEBTORS' STATUS REPORT

Reorganized Debtors Sklar Exploration Company LLC ("**SEC**") and Sklarco LLC ("**Sklarco**")[1] respectfully submit this Status Report in response to the Creditor Trustee's Request for In-Person Status Conference Regarding the September 7, 2023 Monetizing Event Deadline under the Confirmed Second Amended Plan (Docket No. 1988) ("**Creditor Trustee's Request**"), and in advance of the Status Conference set for August 30, 2023.

### Introduction

1. The Reorganized Debtors do not seek any contested orders from the Court at this time and do not believe that any are necessary.  The Reorganized Debtors provide herein a brief overview of the Debtors, the Chapter 11 case progression, the structure and terms of the confirmed plan, and current status.  This Status Report will also respond to a few specific statements made in the Creditor Trustee's Request.

2. The Reorganized Debtors, acting through their plan-appointed Independent Manager, have successfully undertaken their duties under the confirmed plan, have complied with the terms and have materially outperformed projections.   The Reorganized Debtors are addressing the upcoming maturity of the bank secured debt in a considered manner, consistent with the procedure set forth in the confirmed plan, all as discussed below.

---

[1] SEC and Sklarco are referred to together as the "**Reorganized Debtors**" when discussing events after the Effective Date of the confirmed plan, and are referred to as the "**Debtors**" when discussing pre-confirmation events.

25964017.4

## Overview of Debtors and Chapter 11 Case

3. The Debtors commenced their Chapter 11 cases by filing voluntary petitions on April 1, 2020. Detailed background regarding the Debtors is set forth in the Amended Disclosure Statement to Accompany Amended and Restated Joint Plan of Reorganization Dated December 18, 2020 (Docket No. 1101), starting at p. 8. In general, Sklarco and SEC were formed in 1998 by Howard Sklar and other members of the Sklar family. The Sklar family has been in the oil and gas business for decades.

4. SEC previously operated roughly 85 oil and gas wells and two gas plants and engaged in exploratory drilling. Sklarco holds oil and gas leases and interests in properties previously operated by SEC and now operated by three third party operators. In addition, Sklarco holds over a thousand oil and gas leases and interests in other wells operated by third-party operators in numerous states. The Debtor's assets are described in more detail in the Disclosure Statement, pp. 16-17.

5. The Debtors commenced their Chapter 11 cases because, in an environment of low oil prices, they had defaulted on their secured lending facility with East West Bank ("**EWB**") and were concerned about collection actions from EWB (including actions against Sklarco's hedges) and needed the protection of the automatic stay.

6. The Chapter 11 cases were acrimonious. Among other things, sources of contention included allegations regarding the handling of oil and gas revenue received by SEC, the working interest holders' withholding of payment of joint interest billing obligations, Sklarco's ownership of its oil and gas assets (*i.e.,* whether they were held as nominee for certain Sklar family trusts pursuant to an Agency Services Agreement), issues concerning substantive consolidation, and further allegations by the Official Unsecured Creditors Committee ("**Creditors Committee**") concerning pre-petition transfers to the Sklar family (now the subject of a separate adversary proceeding). A creditor moved for appointment of a trustee. In the course of the cases, a Chief Restructuring Officer, Mr. James Katchadurian with CR3 Partners, replaced Howard Sklar as the primary manager of the Debtors during the Chapter 11 cases. Appointment of a CRO, however, did not quell the acrimony and a mediator was needed to help negotiate a plan of reorganization.

## Plan Structure and Terms

7. On August 24, 2021, the Court confirmed the Second Amended and Restated Joint Plan of Reorganization Dated December 18, 2020 (Docket No. 1251) (as modified and confirmed, the "**Plan**"), The structure and terms are, in the view of the Reorganized Debtors, best understood in light of (a) price fluctuations in oil and gas calling for flexibility and (b) the contentious nature of the Chapter 11 case.

8. Pursuant to the Plan, SEC was to wind down operations, and the source of future payments to creditors of both estates would be Sklarco. See Plan § 8.9.

9. The Plan addresses the underlying risks of the business by providing for virtually no fixed payment terms for the prepetition debt. Instead, the plan is fundamentally a cash flow plan. Secured and unsecured creditors are paid from "Available Cash" as that term is defined in Section 1.6 of the Plan, which is roughly cash flow after payment of interest on EWB's secured claim and expenses. Currently, EWB receives 90% of Available Cash, 9% goes to unsecured creditors and 1% to Howard Sklar. See Plan §§ 5.1(b), 6.2(b); see also § 1.29 (Creditor Trust Allocation) and § 1.51 (Howard Trust Allocation). Pursuant to the Plan the EWB Secured Claim was allowed in the amount $24 million, before certain adjustments, with $3 million of that amount allocated to unsecured creditors in a negotiated

compromise embodied in the Plan.

10. The Plan addressed acrimony during the pre-plan stage of the case in its allocation of management and fiduciary responsibility. The engagement of the CRO was terminated and dual plan fiduciaries were installed -- an Independent Manager and a Creditor Trustee -- each with distinct authority and responsibility.

11. A Creditor Trust was formed for the primary purpose of (1) receiving and pursuing claims and Causes of Action (as defined in the Plan); and (2) receiving funds and distributing funds in accordance with the Plan and the Creditor Trust Agreement. See Plan § 8.4. Causes of Action includes claims against Howard Sklar and members of the Sklar family alleged by the Creditors Committee during the Chapter 11 case. The Creditor Trust Agreement submitted with the the Plan Supplement (Docket No. 1247, starting at p. 10 of 86) enumerates a series of specific duties, each pertaining to "Causes of Action" or trust assets. Creditor Trust Agreement § 5.1. Of course, the assets of the Reorganized Debtor are not trust assets. Further, the Plan provides, "The Creditor Trust shall not conduct business activities other than those associated with or related to the litigation of the Causes of Action and distribution of trust assets." Plan, § 8.4; *see also* Creditor Trust Agreement, § 5.2.

12. The Independent Manager manages the day-to-day affairs of the Reorganized Debtors. See Plan § 8.6. The Independent Manager is responsible for, among other things, the wind down and dissolution of SEC. The Independent Manager's other areas of responsibility and authority under the Plan include:

   a) Effectuating the terms of the Plan;
   b) Maintaining control over all bank accounts and funds held and maintained by the Debtors;
   c) Making distributions to creditors, except those distributions to be made by the Creditor Trust and the Howard Sklar Trust;
   d) Maintaining control over expenditures;
   e) Directing business decisions by the Debtors, including performance of any projects for which SEC previously received cash call advances on those Operating Agreements assumed by SEC; and
   f) Pursuing collections of accounts receivable and other payment obligations, including without limitation, any JIB Obligation owed to the Debtors in the ordinary course of business prior to and/or after the Effective Date, including resolution, whether through litigation, settlement, or otherwise, any claims for setoff or recoupment.

Plan, § 8.6.

13. Notably, the Creditor Trustee, whose primary responsibilities involve litigation, was selected by the Creditors Committee. Plan § 8.4. The Independent Manager, in contrast, was selected by agreement of EWB and the Debtors. Plan § 8.6. The Creditor Trustee is Thomas M. Kim. The Independent Manager is Brad Walker of Riverbend SSG.

14. Upon confirmation of the Plan, the statutory Creditors Committee dissolved. See Plan, §11.7. The Creditor Trust Agreement provides for a Creditor Trust Oversight Committee, in Article VIII thereof. The Creditor Trust Oversight Committee must authorize any action by the Creditor Trustee to "pursue, commence or settle any Causes of Action." Creditor Trust Agreement, § 5.2. The Creditor Trust Oversight Committee may also remove the Creditor Trustee by vote and name a successor Creditor

3

25964017.4

Trustee. Creditor Trust Agreement §§ 7.2, 7.3.

15. The Creditor Trustee and Independent Manager are parallel fiduciaries, with distinct authority and responsibility, each independent of the other. Neither fiduciary is subordinate to the other. Neither was appointed by the other, or may be removed by the other. Neither reports to the other, except for those specified topics in the Plan where the parties are to consult. And nothing in the Plan confers authority or supervisory rights upon the Creditor Trust Oversight Committee over the Independent Manager.

16. As between the Creditor Trustee and the Independent Manager, it is the Independent Manager who has authority to manage the business, effectuate the terms of the Plan, and (as discussed below) manage and direct activities related to a potential Monetizing Event.

### Activities and Performance of the Reorganized Debtors

17. The performance of the Reorganized Debtors under the management of the Independent Manager has been highly successful. Not only have the Reorganized Debtors complied with the Plan, their financial performance has more than doubled projections. The Reorganized Debtors are $7.7 million ahead of Plan. Sklarco has seen the expansion of oil barrels and natural gas produced. The SEC winddown is moving forward. As of the date of this Status Report, SEC has transitioned operations of all but one well to new operators.

18. In addition to operational expenses and interest payments, the payments made to reduce the EWB principal, distributions under the waterfall and debtor-settled claims as of June 30, 2023 total:

| Creditor | Projected | Actual | Act. v. Proj. |
|---|---|---|---|
| EWB | $4,871,000 | $11,160,000 | $6,289,000 |
| Creditor Trust | $ 736,900 | $ 2,054,700 | $1,317,800 |
| Howard Sklar | $ 54,100 | $ 124,000 | $ 69,900 |
| | | | **$7,676,700** |

19. The Independent Manager has not simply squeezed Sklarco for cash flow but has invested in wells and operations as appropriate. For example, the CRO had slated two specific wells for abandonment. The Independent Manager instead invested approximately $500,000 in them and they are now generating a return of $1 million to $1.5 million annually. The Independent Manager is making new investments in wells what will add value to the enterprise, including two sets of wells in the Permian Basin (Eddy County, New Mexico). Additionally, Sklarco oversees reinvestments in approximately 1000 wells and land interest holdings.

20. All of this is in harmony with the Reorganized Debtors' powers and duties under the Plan, which authorizes the Reorganized Debtors to "operate their business free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, subject only to the terms and conditions of the Plan, the Confirmation Order and the documents and instruments executed and delivered in connection therewith." Plan, § 8.1. Importantly, the business decisions have also been made in regular consultation with EWB. See Plan § 5.1(b) ("The Reorganized Debtors shall continue to provide regular cash budgets to, and in consultation with, EWB.").

25964017.4

**Preparation for Maturity of EWB Secured Claim**

21. The EWB Secured Claim matures on September 7, 2023, the second anniversary of the Effective Date of the Plan. Plan § 5.1(d). Because no one expected the EWB Secured Claim to be fully paid down by two years' worth of Available Cash distributions, the Plan contemplates a sale or refinance, referred to in the Plan as a "Monetizing Event." See Plan § 1.62.

22. Section 5.1(d) provides a process whereby the Reorganized Debtors undertake the process of preparing for a Monetizing Event. The Reorganized Debtors have undertaken the appropriate steps as set forth in the Plan.:

   a. The Plan required that, on or before [March 7, 2023] (being six months before maturity), the Reorganized Debtors "in consultation with EWB and the Creditor Trustee shall determine if a marketing and sale process must be commenced." Plan § 5.1(d). On March 7, after consultation with the Creditor Trustee and EWB, the Reorganized Debtors determined to commence a marketing and sale process, and communicated the determination to EWB, the Creditor Trustee and Howard Sklar (see attached **Exhibit A**).

   b. The Plan also required that, on or before [April 7, 2023] (being five months before maturity), "Following .. consultation with EWB and the Creditor Trustee, the Reorganized Debtors shall make an election … either to pursue a refinancing based on a commercially reasonable likelihood that a refinancing will occur, or to market and sell the Reorganized Debtors assets." Id. The Reorganized Debtors timely made the election to pursue refinancing, again after consultation with EWB and the Creditor Trustee, and communicated the election to EWB, the Creditor Trustee and Howard Sklar (see attached **Exhibit B**).

23. Although clear from the structure and language of the Plan, section 5.1(d) also expressly states that the Creditor Trustee does not have a consent right or a veto over the elections provided above or against the Reorganized Debtors' right and power to consummate a refinancing the transaction. Section 5.1(d)'s language in this regard is:

"[T]he Creditor Trustee shall not have the ability or authority to veto the decisions made by the Reorganized Debtors and shall not have any authority or right to interfere with EWB's sole and absolute discretion regarding the collateral securing the EWB Secured Claim as provided in accordance with the EWB Loan and Security Documents under the Plan."

24. The notifications and formal elections referenced above came from careful consideration, survey of the asset value and market conditions, and advice from outside parties – all of which informed the judgment of the Independent Manager along with his own knowledge of the assets acquired in the management of them. As an initial matter, the post-Effective Date financial performance reduced the secured debt below that projected. Moreover, the financial performance and underlying value of the post-Effective Date Sklarco indicated more prospects for refinance, as distinct from sale. Finally, the new wells and other assets in which the Independent Manager has invested add value beyond the current financial performance. All of this shows refinance as the best commercial option.

25964017.4

25. The Reorganized Debtors also obtained outside financial advice from an investment banker specializing in oil and gas transactions, TenOaks Advisors LLC, to prepare an analysis of values and recommend courses of action to maximize return to stakeholders. The investment banker's report was finalized in March 2023 and shared with the Creditor Trustee pursuant to a Nondisclosure Agreement. The takeaway of the report – that Sklarco's assets have tremendous inherent cash flow value but the value is unlikely to be realized in a sale – helped inform the Independent Manager's election on April 6, 2023 to elect refinancing efforts.

26. Subsequent input from outside professionals, including a preliminary mid-year reserve report received in the last days showing a $45 million PV 9% Proved Producing, reinforces the Independent Manager's assessment to pursue a refinance.

27. In terms of process, the investment banker has assembled a presentation and a data room, has canvassed prospective lenders, and has given access to certain interested parties who have signed a nondisclosure agreement.

### Partial Consensus Among Parties

28. At least partial consensus among the relevant parties has been reached. First, the Creditor Trustee, having seen the investment banker's report in March, has supported (or at least not objected to) the Debtors' decision to seek refinancing. Indeed, with the Creditor Trustee's knowledge and support, the Reorganized Debtor attempted over a period of time to persuade EWB to simply extend its maturity date. The Reorganized Debtors pursued that possibility for several business reason. EWB has expressed its disinclination to extend, as is its right, and the Reorganized Debtors are pursuing outside financing sources.

29. Second, the Reorganized Debtors have been able to attain consensus with the affected parties – the Creditor Trust and Howard Sklar – to a clarification in the interpretation of the definition of Available Cash. The parties have agreed that Available Cash should be interpreted to read as follows:

> "Available Cash" means net revenue owned by Sklarco and SEC, determined in arrears on a quarterly basis, whether maintained in accounts owned by Sklarco or SEC, and after (1) payment of expenses, including payment of joint interest billing obligations to third party operators, (2) contribution(s) to the Reserve Fund in accordance with the budgets prepared by the Reorganized Debtors, and (3)(a) prior to a Monetizing Event, payment of interest on account of the EWB Secured Claim; or (b) after a Monetizing Event resulting in a refinance of the EWB Secured Claim, payment of any debt service payments required for a new loan, provided however that in no event shall the portion of Available Cash after a Monetization Event payable toward the Creditor Trust Allocation and Howard Trust Allocation, in the aggregate, be reduced to an amount less than the portion of Available Cash paid in the aggregate on the Creditor Trust Allocation and the Howard Trust Allocation immediately preceding the refinance without the written agreement of the Creditor Trust and Howard Trust.

30. Section 11.3(2) of the Plan expressly authorizes post-confirmation clarifications to the Plan to "correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan." These corrections may be done with the approval of the Bankruptcy Court but without notice to all holders of Claims or Interests, insofar as it does not materially and adversely affect the Holders of Claims or Interests. The clarification to Available

Cash provided herein fits within this category of correction, in that this clarification will expedite consummation of the refinancing called for under the Plan, it does not materially impact any party, and it reflects consensus as to how the Plan should be interpreted and applied. Accordingly, the Reorganized Debtors shall request by separate pleading an order approving the clarification to section 1.6.

### No Contested Order or Briefing is Necessary Regarding a Refinance Transaction

31. The Reorganized Debtors are conducting an active and orderly search for refinancing. In due course, the Reorganized Debtors and EWB will be willing and able to close on the refinancing transaction without the need for Bankruptcy Court order. The Plan does not require Court approval and the parties have the necessary authority to close such a transaction. A refinancing reflects not only the best informed judgment of the Independent Manager but also has, the Reorganized Debtors believe, the support of EWB and Howard Sklar. The Creditor Trustee contends that the Reorganized Debtors must raise an additional $3 million in order to consummate a refinancing. The Reorganized Debtor has concluded, after advice from financial advisors, that raising the additional $3 million demanded by the Creditor Trustee would be cost-prohibitive, if achievable at all, and would result in lower recoveries for all stakeholders, including the unsecured creditors who are the beneficiaries of the Creditor Trust. The Creditor Trustee misinterprets the Plan that such a payment is required and, because no order authorizing the refinance transaction is required, no briefing is either. The Reorganized Debtors will respond to a few specific statements made in the Creditor Trustee's Request.

32. As an initial matter, the reference to an alleged "September 7, 2023 Monetizing Event Deadline" under the Plan is fundamentally incorrect. The Plan defines 84 different terms. Not one of them is "Monetizing Event Deadline." Instead, the Plan provides for maturity of the EWB Secured Claim. If it is not paid on maturity, EWB has discretion whether nor not, or when, to enforce remedies. The Reorganized Debtors do not anticipate completion of a refinance transaction prior to the maturity but also believe, based upon discussions and assessment of what is in EWB's best interest, that EWB will not immediately exercise remedies.

33. The Creditor Trust raises an additional concern regarding operation of Section 8.8(b) of the Plan, which provides a waterfall for distribution of proceeds of a Monetizing Event, if and when one occurs. For clarity, section 8.8 is quoted below:

> Upon occurrence of a Monetizing Event, the proceeds of such Monetizing Event shall be distributed as follows:
>
> a. First, to EWB up to $21 million [less certain adjustments], as satisfaction in full of the EWB Secured Claim.
> b. Second, to the Creditor Trust up to the amount of $3 million flowing from the agreed allocation of the EWB Secured claim, in addition to the amounts received from the sale of any assets in which the Creditor Trust has been granted an interest;
> c. Third, to the Creditor Trust and the Howard Trust in accordance with the Creditor Trust Allocation and the Howard Sklar Trust Allocation, respectively, until the earlier of i) payment in full of the Creditor Trust Payment Obligation o, or ii) payment in full of all Allowed Class 6 and Class C Claims;
> d. Fourth, all remaining funds, if any, to the Class 7 and Class D Interest Holders.

25964017.4

34. The Reorganized Debtors intend to comply with Section 8.8(b) and will not direct the proceeds of a Monetizing Event contrary to the waterfall provided therein. The fact that proceeds are not anticipated to be sufficient to reach the level of 8.8(b) in the waterfall does not prohibit a transaction. The Creditor Trustee points to no Plan provision that does. On its face, section 8.8 is merely a waterfall, not an affirmative payment obligation or condition to a Monetizing Event. Certainly the Creditor Trustee would not contend that a transaction must generate proceeds sufficient to pay the tranches in 8.8(c) or 8.8(d) as a condition to a transaction.

35. The Creditor Trustee appears to suggest its $3 million allocation within the EWB Secured Claim gives it a priming position over EWB. That suggestion, if intended, is directly contrary to section 8.8(b) and is not supported elsewhere in the Plan. Nor does any provision of the Plan purport to convey upon the Creditor Trustee the rights of the Holder of the EWB Secured Claim other than participation in the waterfall set forth in section 8.8. The EWB Secured Claim is defined as the "Allowed Secured Claim of EWB in the amount of $24,000,000.00." Plan § 1.43.

36. To the contrary, section 5.1(d) of the Plan expressly provides that the "Creditor Trustee … shall not have any authority or right to interfere with EWB's sole and absolute discretion regarding the collateral securing the EWB Secured Claim as provided in accordance with the EWB Loan and Security Documents under the Plan."

37. The Plan, as set forth above, works in the interest of all stakeholders, including the unsecured creditors, whose best means of full recovery is payment over time from cash flow. Moreover, because this is a refinance transaction and not a sale, the assets are still with the Reorganized Debtor. Moreover, the Plan contemplates the possibility of more than one Monetizing Event (with no deadlines for their occurrence). See Plan § 8.8 (referring to "a" Monetizing Event, not "the" Monetizing Event). If a future Monetizing Event were to occur, 8.8(b) would still apply. Indeed, the Creditor Trust has received over $2 million already, well ahead of projections, which he is not willing to credit to the amounts asserted payable under the waterfall.

38. Accordingly, the Creditor Trustee permission is not required and no contested Court orders nor briefing are necessary as a condition to consummation of the refinancing transaction.

**Fant Energy's Joinder and Request for Rule 2004 Relief is Without Merit**

39. Fant Energy Limited ("**Fant**") filed a Joinder (Docket No. 1991) to the Creditor Trustee's request for a Status Conference and further requests authority pursuant to Rule 2004 so subpoena the Reorganized Debtors for information that they would like to use to make a bid for the Reorganized Debtors's assets. Fant's request is without merit. To the contrary, Fant's involvement highlights the need for the Independent Manager to exercise his business judgment without outside interference, as the Plan provides.

40. As Fant mentions, it is a member of the Creditor Trust Oversight Committee. Fant approached the Reorganized Debtors in June 2023 stating that it believes creditors are best served by receiving money over the long term, and offered potential assistance in refinancing the EWB Secured Clam. Fant, in its capacity as a Creditor Trust Oversight Committee member, signed a Nondisclosure Agreement limiting use of confidential information to its role in that capacity and became privy to confidential information among other potential times, at meeting on July 19, 2023, with the Reorganized

8

Debtors, the Creditor Trustee, Howard Sklar and Fant.[2]

41.     Before a second meeting (held on August 8) involving the parties above and also including EWB representatives and all members of the Creditor Trust Oversight Committee able to attend, Fant disclosed that its interest may also involve acquisition of the Reorganized Debtors' assets. After the second meeting, Fant asked to be given access to the financial advisors' data room.  Counsel for the Reorganized Debtor sent to Fant the attached email correspondence, stating that Fant would need to sign the same form of nondisclosure agreement and other interested parties and reminding Fant that the process underway was for refinance, not sale.   See **Exhibit C**.  The Reorganized Debtors received no further communication from Fant except for its Joinder.

42.     Fant has never made a refinancing proposal.  Now, its expressed interest is solely for an acquisition.  Joinder ¶ 2.  Fant has never communicated a proposal or expressed a potential price parameter to the Reorganized Debtors, who saw it for the first time in the Joinder.   Fant proposes "an amount at least sufficient to pay the Debtors' obligations coming due on September 7, 2023."   Joinder ¶ 2.  Because it is only the secured debt "coming due on September 7, 2023," Fant reveals its desire to acquire the assets for the secured debt and wipe out everything and everyone below it.  Starting out as a potential "white knight," Fant shows itself as a bargain-hunter -- looking to force an asset sale by blocking refinance and bidding for the assets at a fraction of their true value.

43.     Fant's Rule 2004 request is wholly inappropriate.  The Plan does not preserve application of Rule 2004 post-Effective Date, except in one specific instance not applicable here.  See Creditor Trust Agreement § 5.1(g).  There cannot be "cause" as required by Rule 2004 because, even if Fant were acting as a unsecured creditor (which it is not), it is not a party with authority to take action or block action under the Plan.  Moreover, a protective order would be necessary prohibiting use of any information in the manner Fant actually intends – as a prospective bidder.  The Plan confers authority and responsibility regarding a refinance process upon the Independent Manager; and Rule 2004 should not be used as a back door.

DATED:  August 23, 2023.

Respectfully submitted,

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**

*/s/  Michael J. Pankow*
Michael J. Pankow, #21212
675 15th Street, Suite 2900
Denver, CO  80202
Tel:  (303) 223-1100
Fax:  (303) 223-1111
mpankow@bhfs.com

*Attorneys for Sklarco, LLC*

---

[2] The Reorganized Debtors have no reason to doubt that Fant has honored its obligations under the Nondisclosure Agreement and make no accusations in that regard.

**KUTNER BRINEN DICKEY RILEY, P.C.**

*/s/ Keri L. Riley*
Keri L. Riley, #47605
1660 Lincoln Street
Suite 1720
Denver, CO 80264
Tel: (303) 832-2400
klr@kutnerlaw.com

*Attorneys for Sklar Exploration Company LLC*

### CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of August, 2023, a true and correct copy of the foregoing **REORGANIZED DEBTORS' STATUS REPORT** was transmitted by electronic means on the parties noted in the Court's ECF transmission facilities.

*/s/ Sheila M. Grisham*
Sheila M. Grisham, Legal Assistant

10

25964017.4