## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

IN RE:

SKLAR EXPLORATION COMPANY, LLC,
EIN: 72-1417930

     Debtor.

Case No. 20-12377-EEB (Main Case)

Chapter 11

---

SKLARCO, LLC,
EIN: 72-1425432

     Debtor.

Case No. 20-12380-EEB

Chapter 11

---

### CREDITOR TRUSTEE'S STATEMENT CONCERNING MOTION BY
### FANT ENERGY LIMITED FOR RULE 2004 EXAMINATION
### OF THE REORGANIZED DEBTORS

Thomas M. Kim, solely in his capacity as Creditor Trustee (the "Creditor Trustee") of the Sklar Creditor Trust (the "Creditor Trust"), files this Statement Concerning the Motion by Fant Energy Limited for Rule 2004 Examination of the Reorganized Debtors (the "Fant Rule 2004 Motion") and states as follows:

### Statement

1.     Fant Energy Limited ("Fant") is an active and valuable member of the oversight committee for the Creditor Trust. The Creditor Trustee is appreciative of the time and resources Fant has devoted to ensuring that unsecured creditors are treated fairly and that the Reorganized Debtors honor the promises they made to unsecured creditors during the Plan confirmation process. It is for those reasons that the Creditor Trustee files this statement in support of Fant's

efforts to conduct a Rule 2004 inquiry into the Reorganized Debtors' efforts to honor their Plan obligations.[1]

2.     As confirmed, the Plan allows the EWB Secured Claim in the amount of $24 million, and requires the Reorganized Debtors to repay the entire outstanding balance of that $24 million claim two years after the Effective Date.[2]  *See* Plan, § 5.1(a) ("the principal amount of the EWB Secured Claim in Class 2 and A shall be allowed as a Secured Claim in the amount of $24 million, less any payments received post-petition and pre-confirmation . . . ."); § 5.1(d) ("The EWB Secured Claim shall become due and payable on the second anniversary of the Effective Date . . .")  The Creditor Trustee understands that the outstanding balance of the EWB Secured Claim as of today is approximately $11.6 million.

3.     The Plan gives the Reorganized Debtors two options to satisfy that $11.6 million payment obligation:  "sale of assets or refinance of the EWB Secured Claim."  *Id.* at § 5.1(d) According to data that the Creditor Trustee has reviewed, the Reorganized Debtors' assets are valued at an amount that would permit them to satisfy the amounts owed to EWB while also repaying the approximately $19 million that is owed to the Creditor Trust.  To the extent that Fant, or any other prospective asset purchaser, makes an offer to purchase the Reorganized Debtors' assets at a price that would allow the Reorganized Debtors to satisfy their obligations to unsecured creditors, the Creditor Trustee supports that transaction.

4.     Despite those promising asset valuations, however, the Reorganized Debtors have announced their decision to not pursue an asset sale.  Instead, they have decided to refinance only

---

[1]     As discussed in more detail below, however, the Creditor Trustee does not support Fant's effort to purchase the Reorganized Debtors' assets to the extent that the transaction would not generate sufficient proceeds to allow the Reorganized Debtors to fully satisfy their obligations to unsecured creditors.

[2]     Unless otherwise defined, capitalized terms are used herein as defined in the Plan.

a portion of the $11.6 million outstanding balance of the EWB Secured Claim, thereby depriving the Creditor Trust of the benefits of the Debtors' promises made in the Plan confirmation process.

5.      Specifically, in the event of a refinance transaction to repay the EWB Secured Claim, the Plan states that the Creditor Trust shall receive $3 million "flowing from the agreed allocation of the EWB Secured Claim." *Id.* at § 8.8(b). As Fant notes in its Rule 2004 Motion, it was the promise of receiving $3 million when the EWB Secured Claim was paid off in two years that induced unsecured creditors to support the Debtors' proposed Plan. *See* Fant Rule 2004 Motion, p. 3, ¶ 6 – p.4, ¶ 8.

6.      The Debtors confirmed their promise to make that $3 million payment to unsecured creditors when they filed a brief support of the Plan:

> . . . in the event of a refinance by Sklarco or a sale of Sklarco assets as contemplated under the Plan, funds will be going to unsecured creditors of Sklarco and SEC. This result is only possible without years of expensive litigation as a result of the settlements included in the Plan. Furthermore, the Plan also provides that, in a sale or refinance, $3 million will be carved out from the secured claim of East West Bank and paid to unsecured creditors. This is a settlement that would not be available to unsecured creditors in the event of a Chapter 7, and is only possible because of the settlement embodied in the Plan [emphasis added].

*See* Plan Brief, Docket No. 1339, p. 13, ¶¶ 56-57.

7.      Counsel for the Creditors Committee, East West Bank, and the Debtors confirmed their understanding that $3 million would be paid to the Creditor Trust upon a refinance of the outstanding balance of the $24 million EWB Secured Claim during the February 11, 2021 disclosure statement hearing. First, Mr. Chris Johnson, counsel for the Creditors Committee, explained that:

> we still have this monetization event, Judge, where we give the Debtor two years, and the bank consented to give the Debtor two years to allow time for prices to recover, for the market to stabilize, to rebuild its business, to try and take out the bank and replace them

> with a new lender to refinance the debt.  If they are unable to
> refinance the debt, the Debtor will go forward with a sale process.
> And under the refinance process the Committee and the unsecured
> creditors, both SEC and Sklarco, will receive $3 million from that
> refinancing out of the bank's claim. . . .
>
> I'll open it up to Mr. Suzuki or Ms. Riley to correct me or to provide
> additional comment, but I just thought it would be useful for you to
> see what we're talking about.

*See* Transcript of February 11, 2021 Disclosure Statement Hearing, p. 20, lln. 14 – 25, attached

hereto as **Exhibit A**.

8.    Counsel for East West Bank voiced his agreement that the promise of a $3 million

payment to unsecured creditors upon a refinance of the $24 million EWB Secured Claim provided

a significant incentive for them to vote in favor of the Plan:

> Your honor, Bryce Suzuki on behalf of East West Bank.  I think Mr.
> Johnson did a nice job summarizing the Plan terms . . . Mr. Johnson
> is correct overall about the structure of the bank's claim, and over
> secured claim, but we're going to sort of split off a portion of that
> for the benefit of unsecured creditors. . . So we think this is a
> structure where the bank is actually giving quite a lot, the creditors
> are getting quite a lot.

**Exhibit A**, p. 26, ln. 15 – p. 27, ln. 15.  Bankruptcy Judge Brown also expressed her understanding

that $3 million from a refinance of the $24 million EWB Secured Claim was going to be paid to

unsecured creditors:

> So is the amount the bank is willing to pony up to help the
> unsecureds out that you mentioned, is that sufficient to pay the cure
> amounts to working interest owners . . . ?

**Exhibit A,** p. 28, lln. 3 – 6.  Counsel for the Debtors (and now the Reorganized Debtors) voiced

no objection to any part of that discussion during the Disclosure Statement hearing.  *Id.*  As noted

in the Fant Rule 2004 Motion, the Reorganized Debtors are judicially estopped from attempting to

distance themselves from their prior descriptions of these material Plan terms.  *See* Fant Rule 2004

Motion, p. 6, FN. 1.

9.      While the Reorganized Debtors were acting within their Plan discretion to elect to focus their efforts on a refinance as opposed to an asset sale, there is no dispute that those efforts did not allow them to timely comply with their Plan obligation to repay the outstanding balance of the $24 million EWB Secured Claim by September 7, 2023.[3]  *See* Fant Rule 2004 Motion, p. 5, ¶ 11.  As a result of that failure, EWB is now pursuing efforts to foreclose on the Reorganized Debtors' assets and force a sheriff's sale which almost certainly will not maximize those assets' value.  The Creditor Trustee opposes any foreclosure sale that does not result in sufficient proceeds to satisfy the Reorganized Debtors' outstanding obligations to unsecured creditors.

10.      For the reasons stated, the Creditor Trustee believes that it is appropriate that the Reorganized Debtors be required to respond to Rule 2004 inquiries concerning their efforts to honor their Plan obligations.  As discussed, those obligations required the Reorganized Debtors to repay the outstanding balance of the $24 million EWB Secured Claim on September 7, 2023.  And the Plan gave the Reorganized Debtors two options, sale or refinance, to generate sufficient funds to satisfy that payment obligation.  Regardless of whether it is a sale or refinance, the Creditor Trustee urges the Reorganized Debtors to immediately pursue and close a transaction which allows them to avoid foreclosure and honor their Plan obligations to unsecured creditors.

---

[3]      The Creditor Trust will be separately filing its own application under Bankruptcy Rule 2004 to conduct an inquiry into the Reorganized Debtors' efforts to comply with their Plan obligations.

Dated this 11th day of October 2023.              Respectfully Submitted,

                                                  **DIAMOND McCARTHY LLP**

                                                  By: */s/ Stephen T. Loden*
                                                      Stephen T. Loden, Co. Reg. No. 45592
                                                      909 Fannin Street, Suite 3700
                                                      Houston, Texas 77010
                                                      Tel. (713) 333-5100
                                                      Fax: (713) 333-5155
                                                      Sloden@diamondmccarthy.com

                                                  *Attorneys for Thomas M. Kim,*
                                                  *Trustee of the Sklarco Creditor Trust*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of October, 2023, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of the filing to all parties who have requested notice of the same.

*/s/ Stephen T. Loden*
Stephen T. Loden
DIAMOND McCARTHY LLP

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

IN RE:                              .   Case No. 20-12377-EEB
                                    .              Chapter 11
SKLAR EXPLORATION COMPANY,   .
LLC, and SKLARCO, LLC,       .   Case No. 20-12380-EEB
                                    .              Chapter 11
        Debtors.                    .
                                    .   Jointly Administered Under
. . . . . . . . . . . . . . . .              20-12377-EEB

**TRANSCRIPT OF ZOOM HEARING ON: (1) ADEQUACY OF DISCLOSURE STATEMENT AND ANY OBJECTIONS THERETO; AND (2) DEBTOR'S MOTION FOR CLARIFICATION OF ORDERS AND TO AUTHORIZE IMMEDIATE OFFSET OF JOINT INTEREST BILLING OBLIGATIONS AND ANY OBJECTIONS THERETO**

BEFORE THE HONORABLE ELIZABETH E. BROWN
UNITED STATES BANKRUPTCY JUDGE

THURSDAY FEBRUARY 11, 2021
DENVER, COLORADO

TRANSCRIPT REQUESTED BY:     KUTNER BRINEN, P.C.
TRANSCRIPT ORDERED ON:       FEBRUARY 17, 2021
TRANSCRIPT DELIVERED ON:     FEBRUARY 23, 2021
TRANSCRIPT PRICE:            $4.85 PER PAGE; $276.45

EXHIBIT "A"

```
 1   APPEARANCES:

 2   For the Debtor:              Keri Riley
                                  James Katchadurian
 3                                Duane Graham

 4   United States Trustee:       Paul Moss

 5   Creditors' Committee:        Chris Johnson
                                  Grant Beiner
 6
     East West Bank               Bryce Suzuki
 7
     Anderson Exploration Energy  Eric Lockridge
 8   Co., TCP Cottonwood, L.P.,
     AEEC II, LLC, and Sugar Oil
 9   Properties:

10   Fant Energy Ltd., JJS        Jennifer Hardy
     Interests Escambia, LLC,
11   JJS Interests Steele Kings,
     LLC, JJS Working Interests,
12   LLC:

13   FPCC USA:                    Joseph Bain

14   Franks Exploration Co.,      Jordan Bird
     AEH Investments, J & A
15   Harris Bundero Investment
     Co., Kingston, Hughes Oil
16   South, KMR Investments,
     Tommy Youngblood:
17
     Kudzu Oil Properties,        Timothy Swanson
18   Alabama Oil Co. & Apple      Craig Geno
     River Investments, Alabama
19   Oil & Gas, LLC:

20   Ad Hoc Committee of Working  Timothy Swanson
     Interest Owners:             David Morgan
21
     Landmark Oil and Gas,        Jim Spencer
22   Landmark Exploration,
     Lexington Investments,
23   Stone Development:

24   Lucas Petroleum Oil:         Duane Brescia

25
```

```
 1   Appearances continued:

 2   Pruet Oil Company, LLC,        Jeremy Retherford
     Pruet Production Co.           Matt Ochs
 3   (Individually and as agent):   Stan Kynerd
                                    David Hilton
 4
     Eastern Energy Services:       Christopher Meredith
 5
     Fant Energy, Ltd:             Brent Cohen
 6
     Liquid Gold Well Service,      Chris Crowley
 7   Inc.:

 8   McCombs Energy, McCombs        Steve Lecholop
     Exploration:
 9

10   Howard Sklar, Howard Sklar     Adam Hirsch
     Trust:
11
     Strago Petroleum Corporation,  Robert Paddock
12   Meritage Energy Ltd.,          Louis Goza
     Gateway Exploration, Harvest   John Aubrey
13   Gas Management, G Crew
     Properties:
14
     Tauber Exploration &           Thomas Shipps
15   Production Co., CTM 2005,       Barnet Skelton, Jr.
     Ltd., I & L Miss I, LP,        Shay Denning
16   Pickens Financial Group,       Trey Sibley
     LLC, MER Energy, Ltd., The     Mike Pickens
17   MR Trust, Tara Rudman
     Revocable Trust, Rudman
18   Family Trust, The Rudman
     Partnership, Feather River
19   75, LLC:

20

21

22

23

24

25
```

1 | Appearances continued:

2 | Court Recorder:                    Clerk's Office
                                       U.S. Bankruptcy Court
3 |                                    721 19th Street
                                       Denver, CO  80202
4 |
      Transcription Service:           AB Litigation Services
5 |                                    216 16th Street, Suite 600
                                       Denver, CO  80202
6 |                                    (303) 296-0017

7 | Proceedings recorded by electronic sound recording;
      transcript produced by transcription service.

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                      (Time Noted:  9:31 a.m.)

2              THE COURT CLERK:  United States Bankruptcy Court

3     for the District of Colorado is now in session.  The

4     Honorable Elizabeth E. Brown, presiding.

5              THE COURT:  Good morning to all.  We are here in

6     the case of *Sklarco, LLC, and Sklar Exploration Company, LLC*,

7     and it's Case Number 20-12377.

8                   We're here on Debtor's motion, and we've got a lot

9     of things to talk about today, so I'm going to go ahead and

10    just jump right in to taking appearances.  So who do we have

11    today for the Debtor, please?

12             MS. RILEY:  Good morning, Your Honor.  This is

13    Keri Riley appearing on behalf of the Debtors Sklar

14    Exploration Company, LLC, and Sklarco, LLC, and I believe the

15    CRO, James Katchadurian, is also on, as well.

16             THE COURT:  Very good.  Thank you.

17             How about for our U.S. Trustee?

18             MR. MOSS:  Good morning, Your Honor.  Paul Moss on

19    behalf of the U.S. Trustee.

20             THE COURT:  Thank you.

21             For East West Bank?

22             MR. SUZUKI:  Good morning, Your Honor.  Bryce

23    Suzuki of the law firm Snell & Wilmer on behalf of East West

24    Bank.

25             THE COURT:  Thank you.

1              For the Committee?

2              MR. JOHNSON:  Good morning, Your Honor.  Chris

3  Johnson on behalf of the Committee.  Also with me is my

4  associate, Mr. Grant Beiner.

5              THE COURT:  Thank you.

6              Do we have anybody for the Anderson parties?

7         (No audible response.)

8              THE COURT:  No?

9              MR. LOCKRIDGE:  Yes, Your Honor.  Eric Lockridge

10  here today for the Anderson parties who are AEEC II, LLC,

11  Anderson Exploration Energy Company, LC, TCP Cottonwood,

12  L.P., also here today for Sugar Oil Properties, L.P.

13              THE COURT:  Thank you.

14              For Baker Hughes Oilfield?  Anybody?

15         (No audible response.)

16              THE COURT:  I'm just going by old appearance

17  lists.

18              Font [sic] Energy?

19              MR. COHEN:  Good morning, Your Honor.  Brent Cohen

20  appearing on behalf of Fant Energy.

21              THE COURT:  Fant, okay.  I always mispronounce it.

22  Thank you.

23              MR. COHEN:  Thanks.

24              THE COURT:  FPCC?

25              MR. BAIN:  Good morning, Your Honor.  Joseph Bain

 1 | on behalf of FPCC.

 2 |         THE COURT:  Thank you.

 3 |         For Franks Exploration, et al?

 4 |         MR. BIRD:  Good morning, Judge.  Jordan Bird on

 5 | behalf of Franks Exploration group.

 6 |         THE COURT:  Thank you.

 7 |         All right.  How about Hall Management, et al.?

 8 |     (No audible response.)

 9 |         THE COURT:  Anybody?  No?

10 |         Okay.  J.F. Howell?

11 |     (No audible response.)

12 |         THE COURT:  Got to take us off mute.

13 |         MR. MORGAN:  This is David Morgan, but I'll be

14 | represented by be represented by Tim Swanson.

15 |         THE COURT:  Okay.  Mr. Swanson, are you there?

16 |         MR. SWANSON:  Good morning, Your Honor.  Tim

17 | Swanson, counsel to the Ad Hock Committee of Working Interest

18 | Owners, of which J.F. Howell interests are indeed a member.

19 |         THE COURT:  Okay.

20 |         JJS Working Interests, et cetera?

21 |         MS. HARDY:  Good morning, Your Honor.  Jennifer

22 | Hardy on behalf of the JJS entities.

23 |         THE COURT:  Thank you.

24 |         The Kudzu parties?  Mr. Geno?

25 |     (No audible response.)

1          THE COURT:  Mr. -- okay, so they filed an

2     objection, I thought they'd -- if you've got us on mute,

3     please unmute.

4          MR. SWANSON:  Judge, I believe Mr. Geno's --

5          MR. GENO:  I'm here, Your Honor.  Craig Geno and

6     Tim Swanson for the Kudzu parties.

7          THE COURT:  Okay.  Thank you.

8          Lucas Petroleum?

9          MR. BRESCIA:  Good morning, Your Honor.  This is

10    Duane Brescia for Lucas Petroleum Group, Inc.

11         THE COURT:  Thank you.

12         McCombs Energy?

13         MR. LECHOLOP:  Good morning, Your Honor.  Steve

14    Lecholop for McCombs Energy and McCombs Exploration.

15         THE COURT:  Thank you.

16         Pruet?

17         MR. RETHERFORD:  Good morning, Your Honor.  Jeremy

18    Retherford, along with Matt Ochs, for all the Pruet

19    Properties.  And also on the line are (unintelligible)

20    representatives, Stan Kynerd and David Hilton.

21         THE COURT:  Thank you.

22         The Strago Group?

23         MR. PADDOCK:  Good morning, Your Honor.  Robert

24    Paddock on behalf of the Strago Group.  And also on the line

25    today are client representatives, Louis Goza and John Aubrey.

```
 1              THE COURT:  Okay.  Thank you.

 2              Tauber Group?

 3         (No audible response.)

 4              THE COURT:  Mr. Skelton?  Mr. --

 5              MR. SHIPPS:  Good morning, Your Honor.  This is

 6    Tom Shipps on behalf of the Tauber Group.  Also here as

 7    counsel, Barnet Skelton, and client representatives Trey

 8    Sibley and Mike Pickens.

 9              THE COURT:  Okay.  Thank you.

10              All right.  And how about MAR Energy, MR Oil and

11    Gas, et cetera?

12         (No audible response.)

13              THE COURT:  Anybody?  No?

14              Is there anybody I haven't called that wishes to

15    enter their appearance?

16              MR. HIRSCH:  Good morning, Your Honor.  Adam

17    Hirsch on behalf of Howard Sklar and Howard Sklar Trust.

18              THE COURT:  Thank you.

19              MR. GRAHAM:  Your Honor, this is Duane Graham,

20    special Alabama counsel (unintelligible).

21              THE COURT:  I couldn't catch what you said at the

22    end about who you represent.

23              MR. GRAHAM:  I'm special Alabama counsel for the

24    Debtors.

25              THE COURT:  Oh, for the Debtors.  Okay.
```

1          MR. SPENCER:  Your Honor, Jim Spencer for the

2     Landmark parties.

3          THE COURT:  Okay.  Thank you.

4          MR. MEREDITH:  Good morning, Judge.  Christopher

5     Meredith for Eastern Energy Services.

6          THE COURT:  Okay.  Hold on.

7        (Brief pause)

8          THE COURT:  All right.  Anybody else?

9          MR. CROWLEY:  Good morning, Your Honor.  Chris

10    Crowley for Liquid Gold Well Services, Inc.

11         THE COURT:  Okay.

12         Anyone else?

13         MR. SHIPPS:  Your Honor, this is Tom Shipps again.

14    You asked a question about MER Energy, and they are also

15    working interest owners, non-operating working interest

16    owners --

17         THE COURT:  Ah.

18         MR. SHIPPS:  -- that we represent.

19         THE COURT:  Got it.  Thank you.  I had to turn the

20    page, so that connection was not obvious.

21         Okay.  Anybody else?

22        (No audible response.)

23         THE COURT:  All right.  I got to ask a question

24    here.  We've been using Zoom in this case a lot, and I'm

25    guessing that you all like that since you don't have to

 1  travel, it's a lot cheaper for your clients.  Show me your

 2  hands if this has been a benefit.

 3       (Brief pause)

 4            THE COURT:  Okay.

 5            Because I have been thinking about, I mean, we all

 6  want to go back to in-person things, but allowing some

 7  combinations for out-of-town folks to participate by Zoom

 8  makes sense.  I get a lot more input into the case, which is

 9  helpful to everyone.  So thank you for being willing to

10  participate this way.

11            All right.  So, Ms. Riley, do you want to begin?

12            MS. RILEY:  Certainly, Your Honor.

13            And the first question that we have for the Court

14  at this point is, where would you like us to start?  We're

15  happy to address either the disclosure statement and the

16  motion to continue the hearing on the disclosure statement,

17  or we can sort of apprise the Court as to where we're at with

18  respect to the offset motion and those issues.

19            THE COURT:  Okay.  I don't care.  So whatever you

20  want to start with.

21            MS. RILEY:  Your Honor, I think maybe the first

22  place to start is with a general status report as to where

23  we're at in this case, and that does tie in pretty

24  significantly to, frankly, both of these motions -- or both

25  of the issues on the table.

1          THE COURT:  Okay.

2          MS. RILEY:  And then we have the disclosure

3  statement, as well.

4          So at this point, the Debtors did file their joint

5  plan of reorganization and a company disclosure statement on

6  December 18th.  Since that time, we also participated in a

7  two-day mediation early in January.  That mediation was

8  attended by not only the Debtors, but also the Unsecured

9  Creditors' Committee, East West Bank, the Ad Hoc Committee

10  of Working Interest Holders, I believe the Tauber group was

11  in attendance for at least the first day, JJS was in

12  attendance, and I believe that Mr. Sklar was in attendance

13  the first day, although I don't know how much the mediator

14  actually interacted with him.

15          That mediation did result in at least, sort of,

16  the preliminary terms of an agreement with respect to the

17  Plan between East West Bank and the Committee and the

18  Debtors, which we have been working to formalize and fill in,

19  really, over the past few weeks.

20          We have reached an agreed term sheet with the

21  Committee and East West Bank that does still need some

22  additional negotiation and modification to incorporate into

23  the terms of an amended plan of reorganization, but that term

24  sheet was circulated to, frankly, I think the entire entry

25  list, yesterday, by email.  So parties have had an

1    opportunity to, maybe not a very long opportunity, but

2    certainly an opportunity to review that term sheet.  And we,

3    of course, are certainly open to any comments and we are

4    willing to discuss those issues going forward, as well.

5         But at this point, because we do have this sort of

6    agreed form of what an amended plan is going to look like, we

7    do believe that it is pertinent to continue the hearing on

8    the adequacy of the disclosure statement given that we will

9    need to incorporate the terms of that agreement into an

10   amended plan and amended disclosure statement in order to

11   ensure that the parties do have adequate information about

12   what that agreement is going to look like and what the

13   amended plan is going to look like going forward.

14        I would note that a number of the objections that

15   have been filed to the motion to continue the disclosure

16   statement hearing were really substantive objections to the

17   disclosure statement themselves.  A number of those issues

18   have been resolved, or we believe will be resolved, by virtue

19   of the agreements that were reached between the bank, the

20   Committee, and the Debtors, and it will subsequently be

21   incorporated into an amended plan.

22        We recognize that there are likely still a number

23   of issues that will need to be resolved ahead of

24   confirmation, but giving us this additional time to

25   incorporate those terms and file an amended plan will, at the

1    very least, narrow the issues that are going to eventually be

2    before the Court, and should result in a more efficient

3    confirmation process going forward.

4              THE COURT:  Okay.

5              MS. RILEY:  One of the other issues that the

6    Debtor is facing, as well, and this does tie into our,

7    really, the motion to clarify the cash collateral order, is

8    that FCC is continuing to experience a cash crunch that is

9    really related in large part, not just due to the ongoing

10   expenditures in this case, but really related to the

11   nonpayment of joint interest billing obligations by a number

12   of working interest holders.  And that is what prompted us to

13   file our motion to expedite the hearing for an expedited

14   motion to reset a hearing on that particular motion.  Because

15   it's the language of the cash collateral order that is

16   limiting our ability to exercise FCC's rights as an operator

17   under the respective JOAs.

18              Since the filing of the expedited motion to reset

19   the hearing, we have been in contact with a number of parties

20   and have reached agreement, either in writing or sort of in

21   their principal terms, with a number of the working interest

22   holders who have either been withholding JIBs or not paying

23   JIBs at some point during this case.

24              By way of example, with Fant Energy we have agreed

25   that they will continue to remain current on all post-

 1   petition JIBs and reserve their rights to set-off as to any

 2   prepetition unpaid JIBs against their prepetition unpaid

 3   revenue.

 4          We did reach a stipulation with JJS that was filed

 5   yesterday that does preserve JJS's rights of recoupment, but

 6   does provide for them, the JJS entities, to remain current on

 7   their joint interest billing obligations going forward.

 8          We've been in discussions with a number of the

 9   other parties, namely McCombs and Kudzu, regarding agreements

10   along the similar -- along similar lines that would result in

11   payment of JIBs going forward, payment of any, I would say

12   over withheld JIBs, which means that are JIBs that haven't

13   been paid in excess of the amount of any prepetition revenue

14   obligations, and again would ensure that the JIBs payments

15   remain current going forward.

16          THE COURT:  So is Kudzu in the same position as

17   McCombs where they owe more than they are owed?

18          MS. RILEY:  Yes, Your Honor, they are.

19          THE COURT:  Okay.

20          MS. RILEY:  And we have briefly had some

21   discussions with FPCC, as well.  However, we do recognize Mr.

22   Bain reached out to us this morning to discuss a potential

23   continuance on issues with respect to FPCC as a result of

24   some of his recent health issues, and we are amenable to that

25   (unintelligible) if the summary agreement along those lines

1  can be reached.

2       The issue that we still face, even if we reach

3  agreements with these respective parties, is that FCC is

4  still limited in its ability to act as an effective operator

5  on these properties if we are limited in our ability to

6  offset JIBs against revenue for any future defaults.  Because

7  it's not just these four parties, there are hundreds of

8  working interest holders here, and if one of them defaults

9  currently on their JIB payments, we have no ability to offset

10 our net -- their joint interest billing obligations against

11 their revenue unless we either get something in writing from

12 them that authorizes it, or we come back to bankruptcy court

13 and we ask that relief.

14      So that is limiting our ability in the event that

15 somebody does default, if they refuse to pay, if they ignore

16 demand letters, it limits our ability to put them in default

17 and really efficiently act as an operator going forward.

18 We're still paying them their revenue, but they're not paying

19 their proportionate share of the expenses, resulting in,

20 really, scarco (phonetic) by virtue of contributing through

21 any sort of intercompany loan, if additional revenue to cover

22 that nonpayment of the JIBs, putting us in this situation

23 where there are serious cash shortfalls and cash flow issues

24 that really jeopardize the reorganization efforts going

25 forward.

1          So with respect to the motion to continue the

2    disclosure statement hearing, we would ask at this point that

3    the Court set dates by which the Debtors are required to file

4    their amended plan of reorganization and an amended

5    disclosure statement, I would say no later than February

6    26th.  That should give the parties plenty of time to

7    incorporate the terms of an agreement into an amended plan

8    and circulate that.

9          Ideally we, of course, would want to be able to do

10   that sooner, but we recognize that there are, of course, a

11   lot of parties involved, and so we would propose setting that

12   deadline no later than February 26th.

13         And then with respect to the motion for

14   clarification.  We would suggest that with respect to those

15   parties with whom we have reached, sort of, the principal

16   terms of an agreement, we have a stipulation and that would

17   be -- sorry, McCombs and FPCC, we have a stipulation filed no

18   later than February 19th, and that we move forward with the

19   issues regarding the clarification and modification of the

20   language in the cash collateral order today.

21         THE COURT:  Mr. Suzuki, on behalf of the bank are

22   you willing to push this out that far, to the February 26th

23   date?

24         MR. SUZUKI:  With respect to the parties with whom

25   the Debtor's negotiating stipulations, Your Honor?

1          THE COURT:  Well, for the Debtor to file a new

2    amended plan and disclosure statement.

3          MR. SUZUKI:  Oh, I'm sorry.  We're talking about

4    two things there.

5          THE COURT:  Sure.

6          MR. SUZUKI:  We are amenable to that, Your Honor.

7    We think that deadlines make cases, and in this instance we

8    have a term sheet that's been circulated.  The basic

9    structure of the deal, I think, has been really vetted among

10   the three parties that Ms. Riley noted, the Debtors, the

11   bank, and the Committee, over two days of mediation, and then

12   subsequently in numerous iterations.  And so the basic

13   structure, we have hashed out.  Clearly, how that gets

14   translated into a Plan and disclosure statement takes some

15   doing, and we understand that that process takes some time,

16   but expediting that timeline as much as possible, while still

17   being reasonable, we are supportive of.

18          So the short answer is, yes.

19          THE COURT:  Thank you.

20          And the official committee feels the same?

21          MR. JOHNSON:  Good morning, Your Honor.  Chris

22   Johnson on behalf of the Committee.

23          Yes, we did file a joinder supporting the Debtor's

24   motion.  I think that the February 26th deadline is

25   appropriate to push the parties that weren't participants to

1    the initial term sheet, to allow us to get their input and

2    incorporate, you know, those discussions.

3                Judge, I recognize you're working in somewhat of a

4    vacuum.  You saw the Plan was filed on the 18th.  I don't

5    know -- you know, I can tell you from a Committee standpoint

6    that was an objectionable plan.

7                What you haven't seen is the term sheet, and so I

8    think it would be helpful for you if I just gave you a basic

9    understanding of the structure.

10               The structure still provides for both debtors to

11   reorganize.  There would be a joint plan, with the creation

12   of a post-confirmation trust.  The post-confirmation trust is

13   for the benefit of creditors of both FCC and Sklarco, so they

14   are treated pari passu under a single post-confirmation

15   trust.  That trust has the responsibility to investigate and

16   pursue all claims of the estate, including claims against

17   insiders.  You know, those are all major, modifications from

18   the current plan that's on file.

19               The significant part of the negotiation with East

20   West Bank provides that, while the bank is claims allowed,

21   the bank will fund a war chest for the Committee.  The bank

22   will allow a portion of its collateral, what we're calling

23   the available cash, to be used to pay cured claims.  And

24   that's going to be a point of discussion, a point of dispute,

25   and a point of negotiation that I think we're going to have

1  to work through how much of that, you know, will be allocated

2  to pay cure claims and when can we satisfy cure claims.

3  That's all to be negotiated.

4          But the other significant portion of this deal is

5  the recognition by the bank that some assets are unencumbered

6  and the proceeds from the operation or the sale of those

7  assets are certain (unintelligible) interests, and third-

8  party investments will flow to the trust.

9          And with respect to what we're calling the "bank

10 collateral," they're agreeing that approximately $1 million

11 that was paid post-petition is adequate protection payments

12 and applied to post-petition interest, will instead be

13 applied to reduce the amount of their claim.

14          And that, you know, we still have this

15 monetization event, Judge, where we give the Debtor two

16 years, and the bank's consented to give the Debtor two years

17 to allow time for prices to recover, for the market to

18 stabilize, to rebuild its business, to try to take out the

19 bank and replace them with a new lender to refinance the

20 debt.

21          If they are unable to refinance the debt, the

22 Debtor will go forward with the sale process.  And under the

23 refinancing process the Committee and the unsecured

24 creditors, both FCC and Sklarco, will receive $3 million from

25 that refinancing out of the bank's claim.

1          Additionally, if there is a sale event the

2   unsecured creditors, and here's another problematic issue,

3   the trust would receive the equity from the sale above the

4   amount of the bank's claim until a certain amount, either the

5   unsecured creditors are paid in full, or there's a note

6   component that would be satisfied.

7          I recognize based on Mr. -- or, our discussions

8   with Mr. Hirsch, Mr. Sklar doesn't agree that the Committee

9   is entitled to that, that unsecured creditors are entitled to

10  any portion of Sklarco assets or revenue over and above the

11  amount of the bank claims.  So that's going to be something

12  that, you know, we're going to probably coming to you, Judge,

13  to take a look at and to address.

14         I think those are the major parts.  I'll open it

15  up to Mr. Suzuki or Ms. Riley to correct me or to provide

16  additional comment.  But I just thought it would be useful

17  for you to see what we're talking about.

18         THE COURT:  That's very helpful.

19         Anything anybody wants to add to that to describe

20  the term sheet?

21         MR. HIRSCH:  Your Honor, this is Adam Hirsch on

22  behalf of Howard Sklar and the Howard Sklar Trust.

23         Your Honor, I appreciate Mr. Johnson's comment.  I

24  think just to preview it.  Mr. --

25         THE COURT:  Hold on.  I can't find you.  You must

1   be buried way below.

2           MR. HIRSCH:  I'm going to be at the bottom, Your

3   Honor.

4           THE COURT:  Trish, how do I get him to show up?

5       (Brief pause)

6           THE COURT:  Speaker view.  Got it.  Thank you.

7           Okay.

8           MR. HIRSCH:  Are we good, Your Honor?

9           THE COURT:  She saved the day, yes.

10          MR. HIRSCH:  Okay.

11          Mr. Sklar and the Howard Sklar Trust do view

12  Sklarco as a solvent entity.  And as Mr. Johnson previewed

13  for the Court, we do take issue with the notion that assets,

14  beyond that necessary to pay the bank, would be in any way

15  contributed to pay the Sklar Exploration creditors without

16  Mr. Sklar's or the Howard Trust's consent.  We oppose that.

17  And so simply to preview that for the Court, that will be an

18  issue I would hope that would not need to be litigated.

19  We've been available, and remain available, to negotiate

20  terms where something could be contributed, but that has not

21  gone very far to date.

22          THE COURT:  Well, let me hear again from Mr.

23  Johnson about -- well, somebody needs to remind me, is it

24  just our CRO, Mr. Katchadurian, or is it the Committee, as

25  well, that were to investigate the transactions or the

1    transfers by the Debtors to Mr. Sklar and his family trust?

2         MS. RILEY:  Your Honor?  Sorry, if I may?  This is

3    Keri Riley.

4         The CRO was tasked with, really, sort of tracing

5    the disposition of the cash call advances and other funds

6    that came into the Debtor on a prepetition basis.  The

7    Unsecured Creditors' Committee did undertake a 2004

8    examination to look into any number of issues, including, but

9    not limited to, I believe, transfers.  And that 2004

10   examination was both of the Debtors and of Mr. Sklar

11   individually.  I would just note that we are still in some

12   discussions regarding the assets that will be assigned to the

13   trust, so --

14        THE COURT:  To his trust?

15        MS. RILEY:  Oh.

16        THE COURT:  Or to this, it's not a liquidating

17   trust, but it's a creditor trust.

18        MS. RILEY:  Right.  The assets will be assigned to

19   the post-confirmation trust.

20        THE COURT:  Got it.

21        MS. RILEY:  So we are still in discussions with

22   the Committee regarding those.

23        THE COURT:  Okay.  I would --

24        Well, Mr. Johnson, tell me a little bit, have you

25   done much investigating yet on possible avoidance actions

 1  against Mr. Sklar?

 2           MR. JOHNSON:  So, Your Honor, we have focused both

 3  on those transactions of potential claims the estates may

 4  have against Mr. Sklar and those trusts, as well as the

 5  Debtor's prepetition conduct and operations and whether or

 6  not there is grounds to treat these as a single business

 7  enterprise.

 8           As the Court heard many times, all of the assets

 9  are at Sklar and all of the debt is at FCC.  FCC never could

10  have operated without continuous capital infusions from

11  Sklarco.  There's very -- and again, I don't want to get into

12  argument, but to answer your question, we investigated the

13  basis for forcing Sklarco to contribute its assets to fund

14  FCC operations, and we believe that we've done a significant

15  investigation, or a sufficient investigation, to allege

16  claims against Mr. Sklar, his trust, and the other family

17  trusts, to preserve those claims in the disclosure statement

18  and pursue those post-confirmation.

19           THE COURT:  Well, I'm going to ask you to file a

20  status report on that investigative effort, and I'd like to -

21  - is two weeks sufficient time?

22           MR. JOHNSON:  It is, Your Honor.

23           THE COURT:  Okay.

24           UNIDENTIFIED MALE:  Your Honor, can we make it the

25  26th, as well?

1          THE COURT:  Certainly.  That sounds great.

2          And Mr. Katchadurian should file his portion of

3 that, as well.

4          MS. RILEY:  Certainly, Your Honor.

5          MR. HIRSCH:  Your Honor, if I may very briefly?

6 Just for clarity of the record --

7          THE COURT:  Mr. Hirsch.

8          MR. HIRSCH:  Yes.  I'm sorry, this

9 (unintelligible).

10          THE COURT:  I see you now, but we always have to

11 remember that the audio has to know who's speaking, because

12 if there's a transcript made, they've got to know.

13          MR. HIRSCH:  Very good.

14          I just wanted to say, just for clarity of the

15 record, just, you know, based on what I just heard I want to

16 make sure that there's no confusion here.

17          One issue may be the claims that would be assigned

18 to the trust and potential Chapter V causes of action that

19 may exist against either Mr. Sklar, or the trust, or either

20 of the various family trusts.  That is a separate issue from

21 when encumbered (unintelligible) assets or outside

22 investments, and may also be contributed to FCC unsecured

23 creditor or clients.  And just to let you -- and we may have

24 a different view on those two, on the two issues.

25          Mr. Sklar acknowledges that people may believe

1   they have claims, obviously we dispute them.  But the notion

2   of assigning those claims to the trust may not be as

3   offensive to Mr. Sklar in deciding assets that properly

4   belong to Sklarco.

5            THE COURT:  Okay.  But somehow I need to know what

6   you all have learned so far about the status of what went out

7   the door to cause the problems that the Debtor is in, to

8   cause the $7 million that was advanced by working interest

9   owners to disappear.

10           MR. HIRSCH:  Understood, Your Honor.  I just

11   wanted to make sure the (unintelligible) the case.

12           THE COURT:  Got it.  Thank you.

13           Okay.  Anybody want to fill the Court in further

14   on pertinent terms on the term sheet?

15           MR. SUZUKI:  Your Honor, Bryce Suzuki on behalf of

16   East West Bank.

17           I think Mr. Johnson did a nice job summarizing the

18   Plan terms.  A couple of other just minor pieces of

19   information to keep in your head, Judge, as we move forward

20   on this with respect to post-petition management.  It was

21   important to the bank, and I think the other creditors, that

22   a level of independence be maintained throughout the post-

23   confirmation era, so to speak, and so there is a provision

24   for an independent manager.

25           Some of what we have to do between now and the

 1  26th is actually identify who that is.  So that's one of our

 2  task lists, but that is something that I think is important

 3  and Your Honor should know about.

 4        Mr. Johnson is correct overall about the structure

 5  of the bank's claim, an over seared claim, but we're going to

 6  sort of split off a portion of that for the benefit of

 7  unsecured creditors, and we're going to apply the adequate

 8  protection payments received post-petition pre-confirmation,

 9  with the exception of bank's attorney's fees, to principal to

10  reduce the overall claim amount of the amortization of that

11  reduced claim amount as it relates to the bank, two-year

12  term, and then a refinance or a sale type of exit event.

13        So we think that this is a structure where the

14  bank is actually giving quite a lot, the creditors are

15  getting quite a lot.  And if we can't get there under this

16  plan structure, Judge, given the cash issues, the cash flow

17  issues on the FCC side, and some real potential adequate

18  protection issues because of the shortfalls from JIBs,

19  effectively Sklarco is using the bank's cash collateral to

20  fund these operations, then this case, I think, decomposes

21  very, very quickly.

22        So to the point that I made earlier, I think it's

23  important to move very quickly, as fast as we reasonably can,

24  to push this through and to get through confirmation.  If

25  this Plan is not going to work, Judge, I think, you know,

1   sort of the parties have spoken and we've got to look at

2   other avenues, likely liquidation scenarios.

3          THE COURT:  All right.  So is the amount the bank

4   is willing to pony up to help the unsecureds out that you

5   mentioned, is that sufficient to pay the cure amounts to

6   working interest owners that -- because to me, I'm not going

7   to approve assumption of agreements that are not promptly

8   cured.  So the original Plan's proposal of paying that off

9   over several years, I would not approve unless the creditor

10  consented.

11         MR. SUZUKI:  Yeah, and that's something that we

12  have to look at.  I mean, as the Plan currently -- or as the

13  term sheet currently contemplates, there would be a term out

14  of some of those.  What's required is assurances of prompt

15  cure.  What "prompt" means is subject to your discretion,

16  Judge, on a case-by-case basis, we understand that.

17         THE COURT:  But that's not going to be years.

18         MR. SUZUKI:  We understand.  And so that's

19  something that we're going to have to, you know, take a hard

20  look at.

21         There's only so much cash that these operations

22  are going to spit off.  And if you service the bank debt and

23  you deal with the excess cash flows, we understand that, you

24  know, those cure payments are going to have to be made.

25  Exactly how much when, we've got to look at the reality of

1   the cash flows and understand how that operates.

2           But Your Honor's comments are well taken.  We

3   understand.  We will work through that.  That's going to be a

4   point of negotiation, I think, between the various parties,

5   including the working interest holders.  But we understand

6   the reality and we're going to address that.

7           THE COURT:  Very good.

8           That kind of takes us back, Ms. Riley, to your

9   comments about you really -- the Debtor really needs this

10  money from the post-petition JIB obligations of the working

11  interest owners now because it's running out of cash, and I

12  understand that.  But to resolve that issue it's going to

13  take an adversary.

14          The cash collateral order and the oil and gas

15  order were heavily negotiated form of orders.  The parties

16  picked the language that appears there, so there's nothing

17  for the Court to clarify.  That language, we all knew, did

18  not go far enough.  It only was a stopgap measure, and it

19  didn't talk about the post-petition offsetting issues

20  directly.  The agreements cover that, of course, but we have

21  the complication of all this prepetition obligation that

22  hasn't been fulfilled by the Debtors.

23          So I am not inclined to do some hurry up adversary

24  proceedings to figure out, you know, this offsetting or

25  recoupment issue when it will all likely be moot.  If the

1 Debtor can't cure these contracts on a very -- on a prompt

2 basis, not over years, then we're wasting our time here, as

3 everybody has said.  And so you've got to get to that cure

4 issue, that's the only way we're going to get there safely.

5 But what I also saw as I read through the

6 objections, and now I know that it involves not just McCombs

7 but also Kudzu, when there is a working interest owner who

8 owes more than the Debtor owes it, when you put pre and post

9 both together, and they just want to hold back and not make

10 payments because they want to see where the debtor goes,

11 whether the debtor ultimately reorganizes or not, that is not

12 how 365 of the Code works.  And parties are supposed to, even

13 if the debtor gets until confirmation to assume executory

14 contracts, and in the meantime the non-debtor party has to

15 keep performing.

16 If there's some real risk to the nonperforming

17 party, then they can ask for a quick deadline to assume or

18 reject, or some other way to push the matter forward.  But

19 when they're not at risk because they owe more than is owed

20 to them, to me I'm going to hold those creditors in contempt

21 if within two weeks' time they don't pay up their post-

22 petition obligations to the extent that it is offset.

23 I'm probably not stating this clearly enough.  But

24 to the extent that the Debtor is owed more money by McCombs

25 and Kudzu, and anybody else in that same situation, they've

 1  got to pay that excess post-petition amount, so.  And I will,
 2  you know, it will -- I will enter contempt orders with
 3  monetary sanctions if that doesn't happen.
 4          So let me hear from the McCombs' counsel and Kudzu
 5  counsel.
 6          MR. LECHOLOP:  Your Honor, Steve Lecholop,
 7  representing McCombs Energy and McCombs Exploration.  Good
 8  morning.
 9          Your Honor, we have been in negotiations over the
10  last day with Ms. Riley to do exactly what the Court
11  suggested.  There will be no need for a contempt.  We have
12  been willing to do exactly what the Court has suggested.  The
13  issue for us has been the lack of engagement in doing -- in
14  resolving this, despite the pleadings that were on -- despite
15  the language in the pleadings, Your Honor.
16          Before I unilaterally reached out to Ms. Riley at
17  4 o'clock yesterday, I hadn't heard from the Debtors a single
18  time.  Now --
19          THE COURT:  But you're experienced bankruptcy
20  counsel, right?
21          MR. LECHOLOP:  Yes, Your Honor.
22          THE COURT:  And so you know that you have an --
23  your clients have an obligation to continue to perform until
24  the point at which it's rejected or assumed, right?
25          MR. LECHOLOP:  That's right, Your Honor.  And as

1 counsel I have advised my client --

2       THE COURT:  Good.

3       MR. LECHOLOP:  -- in the way that I am obligated

4 to advise them.

5       THE COURT:  Then I'm going to help you with the

6 hammer.  They've got two weeks to pony up, or they'll get hit

7 with sanctions.

8       MR. LECHOLOP:  Yes, Your Honor.  Heard loud and

9 clear.

10       THE COURT:  Okay.

11       MR. LECHOLOP:  We will absolutely ensure that that

12 happens.

13       Your Honor, a part of that, there are two parts to

14 that, I just want to make sure Your Honor is clear here.

15       So certainly there is a delta that Your Honor

16 spoke of between what's owed on both sides.  But there are

17 two buckets of money that that's coming from, and so for

18 purposes of awarding contempt I want Your Honor to be very --

19 just to be very clear about where these buckets of money are

20 coming from.

21       THE COURT:  Okay.

22       MR. LECHOLOP:  So on January 25th, Your Honor set

23 the hearing on the motion to clarify for today.  The next set

24 of revenue obligations -- revenue distributions to working

25 interest owners were supposed to be distributed January 31st.

1          THE COURT:  Uh-huh.

2          MR. LECHOLOP:  McCombs, and I believe others, I'm

3     not certain, but I believe others, were not paid those

4     January 31st revenue obligations.  Effectively, the Debtors

5     took the judge's pen and unilaterally rewrote the cash

6     collateral order and oil and gas order, without waiting for

7     Your Honor to rule in any way.

8          I believe under Section 1112 that that, frankly,

9     that disobedience, (unintelligible) violation of a court

10    order is cause for conversion.  However, we, as McCombs, are

11    willing to overlook that.  We are willing to agree that those

12    proceeds can be applied to this delta.  The proceeds I

13    believe are still being held by Sklar, I think Ms. Riley

14    said, in a revenue account.  And then McCombs separately will

15    be -- whatever is remaining between what is being withheld by

16    the Debtors and the delta, we will be cutting a check, so to

17    speak, to the Debtor's bankruptcy estate for purposes of use

18    in the operating account of the Debtors.

19          And so because those numbers may not match up on

20    the ledger as far as a check coming from McCombs to the

21    debtors, I want you to understand there was that separate

22    bucket that's being withheld by the Debtors.

23          THE COURT:  Well, I understand the statement you

24    just made.  I don't know, the Debtor may have a different

25    view of it.  We'll save that for now.  But two weeks is the

 1   time frame for resolving this.

 2            Let me hear also from Kudzu.

 3            MS. RILEY:  Your Honor, if I may just address that

 4   point?  Because those were some fairly serious accusations

 5   that were thrown at the Debtors here.

 6            THE COURT:  You don't need to respond to that, Ms.

 7   Riley.

 8            MS. RILEY:  Thank you.

 9            THE COURT:  I have a lot of skepticism about what

10   was said, so.

11            MS. RILEY:  Thank you, Your Honor.

12            THE COURT:  All right.  Let me hear from Kudzu.

13            MR. GENO:  Please the Court, Craig Geno for Kudzu.

14            It's not the, all the Kudzu parties, Your Honor,

15   because we kind of revert to our three classes, the Kudzu

16   parties that are subject to some of the pointed claims of the

17   Debtor's motion.  It's actually only Kudzu oil properties.

18   Alabama Oil Company and Apple River are current with respect

19   to, or close to current depending on the time of the month,

20   with respect to the agreements that they have with the

21   Debtors.

22            As I understand the Court's statement, but please

23   correct me if I misunderstood you.  When you say that if the

24   Debtors are owed more money than the Debtors owe to the

25   working interest owners, I assume you're talking about only

 1    post-petition and we're not including cash call advances in

 2    that debtor-creditor calculation.

 3          THE COURT:  No.  I think for now let's treat the

 4    pre and the post together and look at who's got the -- who

 5    still owes after an imaginary set-off were to occur.  And if

 6    Kudzu owes more, they need to pay that within two weeks, or

 7    they'll be in contempt.

 8          MR. GENO:  If they are -- if you -- again, Your

 9    Honor, I don't mean to negotiate with the Court, but I want

10    to be clear because contempt is certainly not something we

11    want to be afoul of.  If we combine the cash call advances

12    that Kudzu is owed, plus any post-petition revenue, that

13    debtor-creditor relationship changes significantly.

14          THE COURT:  Okay.  And so maybe you're not in this

15    category.  Because for right now, I'm including the pre and

16    the post, because there is this issue of recoupment that's

17    out there.  That is an interesting legal issue and we could

18    delve into it, but we're not going to because it's going to

19    be moot very quickly in this case.  But I'm saying if there's

20    somebody that when you put pre and post together owes the

21    Debtor at the end of the day, that's not acceptable

22    (unintelligible).

23          MR. GENO:  I -- I'm sorry, Your Honor.

24          THE COURT:  Okay.

25          MR. GENO:  I apologize.  I didn't mean to

1    interrupt you.  I understand that completely.

2         I think that may be the case, but that does not

3    affect the agreement that we tentatively have reached with

4    Ms. Riley with respect to Kudzu, and then respectably,

5    assuming we can get that properly documented, we intend to

6    live by the settlement discussions that we have had with her

7    last night and this morning, as well.

8         THE COURT:  Okay.  If she agrees to it on behalf

9    of the Debtor, Debtors, then the Court will accept that so,

10   if it's some other offsetting arrangement.  Okay.

11        MR. GENO:  Thank you, Judge.

12        THE COURT:  All right.

13        MR. BAIN:  Your Honor, if I may?  This is Joseph

14   Bain on behalf of FPCC.

15        THE COURT:  Okay.

16        MR. BAIN:  We're also in this -- in this -- in

17   this --

18        THE COURT:  Category.

19        MR. BAIN:  Yes, Your Honor.  And of course we

20   fully intend to comply with Your Honor's order.

21        THE COURT:  The bad children sitting in the

22   corner?

23        MR. BAIN:  Well, and, Your Honor, I think I

24   completely understand your position with regards to the

25   recruitment issue.  And honestly, I think we're actually owed

1  more than we currently owe.  But if by some chance there's a

2  disagreement between us and the Debtors, could we ask for a

3  hearing, you know, just to resolve that?  Because obviously

4  we don't want to be in the position where, you know --

5           THE COURT:  You can always interplead money, just

6  the disputed portion of it.

7           MR. BAIN:  Understood.

8           THE COURT:  But I want everybody to --

9           MR. BAIN:  Right.

10           THE COURT:  -- follow 365.

11           MR. BAIN:  Sounds good.

12           THE COURT:  Yeah.  Okay.

13           MR. BAIN:  And then, Your Honor, if I may?

14  There's one additional issue related to that.  And I'm not

15  trying to mudslinging, but just in response to this kind of

16  back and forth.  The Debtors put all of our (unintelligible)

17  and sent us a letter saying that they're going to put all of

18  our revenue in suspense, which makes (unintelligible) just

19  hold it in an account.  We would ask obviously, if we're

20  trying to chew everything up, that they not do that.  Because

21  we would argue that it violates the oil and gas order, and

22  that they take it out of (unintelligible) --

23           THE COURT:  Well, I don't think that oil and gas

24  order really attempted to address this big, looming issue

25  with recoupment and set off.  And it was -- anyways, it was a

1   stopgap measure, it wasn't an attempt to resolve all of this.

2            And as I said, we're going to put our focus on the

3   Plan and the assumption of these agreements, which will

4   require a prompt cure.  Because any other money is just going

5   to be wasted and it's going to be moot.

6            So if Mr. Sklar has to kick in some of the money

7   he took out to front some of the operations going forward,

8   you know, whatever the Debtor needs to do, go to the bank, go

9   to Mr. Sklar, whoever, that should occur if you are in dire

10  need of money.  But we're not going to hold things up and try

11  to -- and try an adversary on this now.

12           MR. BAIN:  I see.

13           THE COURT:  So.

14           MR. BAIN:  Thank you, Your Honor.

15           THE COURT:  Okay.

16           Well, I'm going to grant the Debtor's request to

17  continue, or to set a deadline for the filing of the amended

18  plan and disclosure statement by February 26th.  We know that

19  we've got the status reports coming on transfer analysis

20  investigation by the Committee and the CRO by the 26th.

21           What else can we do today?

22           UNIDENTIFIED MALE:  Judge?

23           MR. SKELTON:  Your Honor?

24           THE COURT:  Mr. Skelton.

25           MR. SKELTON:  Yes.  One of the things I raised in

1  our response, and of course I'd like it to be at least a week

2  earlier that this deadline is set, but so be it.  But one of

3  the things you made clear at our December 4th status

4  conference is that when the Plan is filed, and the Plan

5  provides for the assumption of executory contract, there

6  shall be a separate motion filed for each such contract.

7          THE COURT:  Correct.

8          MR. SKELTON:  That did not happen, and that must

9  happen.  Because the absolutely crucial -- one of the

10  absolutely crucial issues for the working interest owners is

11  cure.

12          THE COURT:  Right.

13          MR. SKELTON:  And this is a check's in the mail

14  proposition that was in the original plan, which is not

15  acceptable.  And our position, well, which I think is what

16  you were stating, is that "prompt means prompt," as Professor

17  Norton said in his treatise.  And so we think that's

18  absolutely essential.

19          We'd also hope, if there is any ability to

20  compress some of the time periods from, you know, disclosure

21  statement hearing and confirmation hearing, we would urge

22  that there be as much compression as possible.  Because among

23  the points that several other parties have made, is the burn

24  rate in this case is very serious and we just cannot afford

25  to, you know, lollygag around.

1          I'm not going to point any fingers about why are

2    we here now, because yesterday, yesterday, is the first time

3    there has been any reach out from the Debtor, with a term

4    sheet or anything, for any of the working interest owners.

5    And so, but here we are.  But I think, frankly, the Debtor's

6    got to be on a short leash.

7               THE COURT:  Okay.

8               MR. SKELTON:  And --

9               THE COURT:  Okay.  I hear that point.  And what

10   I'll do is set the February 26th deadline to include filing

11   the motions to assume contracts.

12              MR. SKELTON:  Thank you.

13              THE COURT:  And rejection, as well.  We might as

14   well get those out.  And I can approve those without a plan

15   confirmation.

16          I won't approve the motions to assume unless we

17   also confirm the Plan.  But we ought to tease out there and

18   find out what the cure amounts are and where we're apart on

19   that amount, et cetera.  So that groundwork needs to happen

20   in tandem with the Plan process.

21              MS. RILEY:  So, my apologies, Your Honor.  This is

22   Keri Riley for the Debtors.  I just want to be clear.

23          So February 26th would also be the deadline to

24   file any motions to assume --

25              THE COURT:  Or reject.

```
 1              MS. RILEY:  -- or reject.

 2              And, Your Honor, if we may, to the extent that

 3   there are operating agreements that FCC intends to reject,

 4   would Your Honor be amenable to us filing, perhaps, an

 5   omnibus motion to reject those?

 6              THE COURT:  Yes.  Omnibus on the rejection is

 7   fine.  But I think in your title, I think there were only 13

 8   that you were indicating you were going to reject?

 9              MS. RILEY:  I believe so, Your Honor.

10              THE COURT:  So why don't you put that in

11   parentheses and make it a long title, so it just draws

12   peoples' eyes to it more, who is being rejected.  Because

13   there may be a lot of those contracts that haven't been

14   heavily involved in these proceedings, and they get a piece

15   of paper and they tend to throw it away, so.

16              MS. RILEY:  Certainly, Your Honor.

17              THE COURT:  Okay.

18              And then the motion to assume, obviously by

19   separate motion for each contract.  I know it's 156 of them,

20   if you need to hire some contract help to help you, you know,

21   I will act on that employment application quickly.

22              MS. RILEY:  Thank you, Your Honor.

23              THE COURT:  Okay.

24              And let's talk about the response time.  Frankly,

25   I don't remember what it is under the rules.  It's at least
```

```
 1   two weeks, I'm sure.

 2              MS. RILEY:  (Unintelligible) --

 3              THE COURT:  Is any -- go ahead.

 4              MS. RILEY:  My apologies, Your Honor.

 5              It's generally 14 days for a response on a motion

 6   to assume or reject under the local rules.  But given that

 7   some of these will need to be mailed to a large number of

 8   people in Alabama, or Louisiana, or, I mean, really, a lot of

 9   places outside of Colorado, it may make sense to extend that

10   in this case, particularly given that it will sort of be dual

11   tracked with a plan and disclosure statement.

12              THE COURT:  Well, I want them to speak up about

13   what they think they're owed, the netting of all these

14   things, so that you can react to that and we can tie that in

15   with confirmation and keep both moving forward.  So let's

16   keep it with the 14 days.  I was going to suggest shortening

17   it, but you've convinced me not to.

18              Okay.

19              MR. SUZUKI:  Your Honor, Bryce Suzuki on behalf of

20   East West Bank.  May I be just heard on a --

21              THE COURT:  Certainly.

22              MR. SUZUKI:  -- couple of issues?

23              THE COURT:  Okay.

24              MR. SUZUKI:  I'm not going to -- you're not going

25   to believe this, but I actually agree with Mr. Skelton on a
```

1    point.  Which is, we do need to keep this moving forward, and

2    I actually appreciate the comments.  If we can compressed the

3    time frame, the bank is certainly amenable to that.  We are

4    committed to working however hard we need to work to make

5    that happen.  So to the extent some of these time frames can

6    be truncated, for example between the time of disclosure

7    statement approval and confirmation hearing, we would

8    certainly appreciate that.  We think that's important given

9    the cash issues.

10              And to that point, Your Honor, I do have one

11   question of clarification which is, someone asked about

12   whether the set-off, or recoupment, or whatever we're going

13   to call it, or the preservation of that right, would include

14   both prepetition revenue amounts owed versus the JIBs, or

15   also amounts owed for cash call advances.  And I don't know

16   that I understood exactly the response to that.

17              And that's important, Judge, because the cash call

18   advances, they're not owed in the same way that -- there's a

19   claim there, there's certainly liability --

20              THE COURT:  Well, it might --

21              MR. SUZUKI:  -- and the Debtor meeting

22   (unintelligible) --

23              THE COURT:  It might be set-off, but it's not

24   recoupment, you're suggesting?

25              MR. SUZUKI:  Well, you know, so those -- you know,

1  cash call advances are provided, and then they are, you know,

2  you're supposed to go do your project.  Well, the Debtor may

3  still go do that project.  It's not that they owe a

4  repayment, an immediate payment obligation on the cash call

5  advances.  And so adding those two together creates, in my

6  view, a more inflated prepetition claim.

7          And the bank's ox really is kind of gored by this,

8  because the less that the JIBs come in, the more the bank's

9  cash collateral is the sole source of funding for the case.

10 And that pool of cash collateral has shrunk dramatically over

11 the term of the case, and so I view that as shifting a lot of

12 the risk to the bank, and the bank has borne a lot of that

13 risk to this point.

14         So I guess my request would be if we're going to

15 determine what amount the excess that must be paid within the

16 two weeks, then it really should be based on what is owed for

17 prepetition oil and gas revenue payments versus post-petition

18 JIBs and not put every, you know, bid of prepetition claim

19 together.  Because that just seems inappropriate given the

20 distinction between cash call advances and a revenue claim,

21 which is a claim for a right to payment.

22         THE COURT:  And yet, with the cure of those

23 contracts, both would be taken into account, would they not?

24         MR. SUZUKI:  Well, the cash call advances, from

25 our perspective, Your Honor, is those are funds that were

 1   advanced for a project.  So adequate assurance of future

 2   performance that those projects would be going forward

 3   without funding --

 4              THE COURT:  Okay.

 5              MR. SUZUKI:  -- could accomplish that result.

 6              Cure payments really are, they're a monetary

 7   breach, and those payment rights need to be, you know, trued

 8   up promptly.

 9              THE COURT:  I understand your point, and I'm sure

10   that the working interest owners do not agree.

11              MR. SUZUKI:  I'm (unintelligible).  I'm sure they

12   don't.

13              THE COURT:  Oh, I don't --

14              MR. SUZUKI:  But this is --

15              THE COURT:  They don't --

16              MR. SUZUKI:  -- (unintelligible).

17              THE COURT:  We don't need to hear from all the

18   working interest owners to know that they don't agree with

19   that.

20              MR. SWANSON:  Your Honor?  Your Honor, this is Tim

21   Swanson, counsel for the Ad Hock Committee of Working

22   Interest Owners.  I'm wondering if we may be heard on several

23   of these points.

24              THE COURT:  You may, briefly.  As I said, I don't

25   doubt that you dispute that.

1          MR. SWANSON:  Right.  We obviously would dispute

2  that.

3          And, you know, we don't share as much optimism as

4  the next two weeks may bring.  We think there are, again,

5  some really substantial flaws with the previous plan, but we

6  don't see that this most recent term sheet has addressed many

7  of those.

8          And Your Honor has identified, perhaps, a

9  threshold issue.  And so when there are, you know, statements

10  of oxes being gored, let's not forget how the Debtor got to

11  where it is, and the working interest owners have seen some

12  cash dissipate.

13          And then, you know, with the prospect of, well,

14  your cure payment you may have to take over a period of time,

15  I understand that doesn't jive with what Your Honor views

16  365(b)(1)(a) to say, we have some skepticism.  And, you know,

17  this purported term sheet, or the term sheet, you know, it

18  was reached between three parties, and the working interest

19  owners, as the Debtors have admitted, you know, they're

20  critical.

21          The Ad Hoc Committee was formed for the purpose

22  of not being heard, and the trust had been burned, and the

23  FCC as an operator operates wells to the benefit of the

24  working interest owner.

25          And so, you know, we think there's a lot of

 1   challenges with the term sheet, and we are in favor of

 2   expediting what Mr. Skelton had mentioned.  And we think it's

 3   critically important that, as the Court is doing, to

 4   scrutinize the further cash burn.  Because if they can't cure

 5   these defaults in accordance with 365, then what are we

 6   doing?  Let's move forward.

 7            And so we would echo those comments, and --

 8            THE COURT:  Okay.  But I do hear Mr. Suzuki's

 9   point that the cash advances that weren't used for the

10   purpose they were supposed to be used for may be an issue of

11   adequate assurances of future performance rather than a cure

12   obligation.  So as you all discuss and trade numbers, you

13   should separate those out.

14            And, you know, if I have to resolve that issue as

15   part of confirmation and assumption, then I will do that.

16   But I think you should, to further your discussions, you

17   should put those -- you should separate those in your mind,

18   as far as calculating numbers.

19            Does everybody, I hope, understand that point?

20            UNIDENTIFIED MALE:  (Unintelligible).

21            THE COURT:  If you're unclear, go ahead.

22            MS. RILEY:  Your Honor, this is Keri Riley for the

23   Debtors.

24            The agreements that we have been discussing,

25   specifically with respect to the payment of the JIBs issue,

1  and those agreements that we've been discussing, have focused

2  on the prepetition revenue and not on any cash call advances.

3  It was never our intention to reach any agreement with a

4  party that any sort of recoupment or set-off would be allowed

5  as to the cash call advance balance, because they are really

6  a performance liability that relates to adequate assurance

7  and future performance.

8          So I did just --

9          THE COURT:  So you agree with the bank?

10         MS. RILEY:  -- want to put that on the -- that's

11  correct.

12         THE COURT:  Okay.

13         And now I think everybody, I hope, if you're not

14  clear and you need the Court to state something further,

15  please let me know, on this point, that whether ultimately I

16  agree with the bank and the debtor's position that the cash

17  call advances aren't a cure amount or not, we need to set out

18  those numbers separately so that we can look at them

19  separately.  So is everybody clear on that?

20         UNIDENTIFIED MALE:  Just one question I have,

21  Judge.  Am I correct that you are not entering an order

22  granting the Debtor's motion today?

23         THE COURT:  That's correct.

24         UNIDENTIFIED MALE:  Okay.  Because --

25         THE COURT:  And, in fact, I'm not going to rule on

1   it.

2                   UNIDENTIFIED MALE:  Okay.

3                   THE COURT:  I mean, I guess I'm denying it on the

4   basis of mootness, because it will be moot by the time we

5   would get to resolving it.

6                   UNIDENTIFIED MALE:  There was another issue, the

7   Exhibit A that showed all the alleged amounts unpaid,

8   included -- my clients have paid their JIBs currently.  But

9   there's always a current amount owed.  I mean, there's always

10  --

11                  THE COURT:  Of course.

12                  UNIDENTIFIED MALE:  And so --

13                  THE COURT:  Of course.

14                  UNIDENTIFIED MALE:  -- you know, we were going to

15  need clarification on that, because they just listed

16  everybody.  So, in any event, I think this resolves it, from

17  our point of view.

18                  THE COURT:  Well, and for that, in the gap

19  amounts, you know, it should probably say -- I don't know,

20  there should be a column for what's due as of when so that we

21  can sort that out.

22                  MR. BAIN:  Your Honor?

23                  THE COURT:  Yes?

24                  MR. BAIN:  Joseph Bain on behalf of FPCC.

25                  We are in the position where we did not reach a

1  deal prior to the hearing, so it's more of a question.  I

2  just want to know what direction to give my client in terms

3  of terming up the JIB amount, and then whether or not we

4  should include the cash call advance amount as part of the

5  hypothetical set-off, if you will, or whether or not they

6  need to include that in the amount or not.

7           THE COURT:  Yeah, we didn't focus on that with the

8  earlier discussion and the contempt possibilities.  I think -

9  - I think for now the cash call advances should not be

10  included.  That money is paid and it, you know, so -- but

11  it's supposed to be used for a project that be Debtor may

12  actually go through with.  So you can still fight about it in

13  the adequate assurance of future performance category.

14           MR. BAIN:  Okay.  And if you don't mind, just to

15  make sure I'm absolutely clear, given the --

16           THE COURT:  Sure.

17           MR. BAIN:  So we will not include that as a

18  deduction in terms of what is owed.  It's not going to be the

19  delta, it's just going to be the revenue amount is all that

20  we are going to --

21           THE COURT:  So if you're looking at recoupment,

22  and under that basis we're putting pre and post together --

23           MR. BAIN:  Right.

24           THE COURT:  -- and netting out who owes who at the

25  end of the day.  The cash call advances should probably not

1  be included in that.

2         MR. BAIN:  Understood.  Thank you, Your Honor.

3         THE COURT:  Sure.

4         And anybody else need any further clarification?

5     (No audible response.)

6         THE COURT:  Okay.  All right.  Anything else we

7  should take care of today?

8         MS. RILEY:  Your Honor, just one point of

9  clarification.  To the extent that there are subsequent

10  parties who fail to pay their JIBs in the amount above any

11  revenue obligations that are owed, obviously, you know, we've

12  discussed it with the parties today, but would the debtors be

13  able to bring subsequent motions for contempt if this issue

14  arises further down the road?

15         THE COURT:  Yes.

16         MS. RILEY:  Thank you, Your Honor.

17         THE COURT:  Okay.

18         MR. PADDOCK:  Your Honor?

19         THE COURT:  But recognizing there are a lot of

20  parties here who weren't forewarned, so it will probably be a

21  motion for an order to show cause.  It won't be, boom,

22  there's contempt right away, because --

23         MS. RILEY:  Certainly, Your Honor.

24         THE COURT:  Okay.

25         MR. PADDOCK:  Your Honor, Robert Paddock on behalf

1  of Strago group.  I just had one procedural comment or

2  question to make.

3          With respect to the motion to assume or reject, I

4  know Ms. Riley suggested she needed additional time

5  (unintelligible) the original 14 days because of the issues

6  related to assumption.  But with respect to those JOA's,

7  which are (unintelligible) my client's JOAs, that the Debtor

8  intends on rejecting.  And maybe this is a question of Ms.

9  Riley here in front of the Court.  Is there any reason that

10 that time period couldn't be shortened to seven days?

11 Because it's a little different animal and a little simpler

12 than the motion to assume, which I understand is slightly

13 more complicated.  So all I'm -- I guess all I'm asking the

14 Court is, could we have a shortening of time for the response

15 time on this on this omnibus motion to reject?

16         THE COURT:  Because you might have another payment

17 coming due?

18         MR. PADDOCK:  Maybe.  Maybe.

19         THE COURT:  I understand that.

20         Ms. Riley?

21         MS. RILEY:  Your Honor, overall I don't know that

22 I am opposed to shortening the time frame on a motion to

23 reject.  My concern is, just again, that there are a lot of

24 parties that this does need to go out to.  But if the Court

25 is amenable to shortening the notice period after the motion

 1  is filed, then I think we would be open to that.

 2          As far as shortening the time frame before it's

 3  filed, frankly, we're going to need 14 days at a minimum.

 4          THE COURT:  How about with Counsel's request to

 5  shorten just on his contract?  And this is not your time to

 6  send the motion in, but his time to respond.

 7          MS. RILEY:  Certainly.

 8          THE COURT:  So is that -- it'll either be an issue

 9  or it will be uncontested and an order can enter and he can

10  avoid another payment.

11          MS. RILEY:  Thank you, Your Honor.

12          THE COURT:  Okay.

13          All right.  Anything else for today?

14          THE COURT CLERK:  Your Honor, do you want to set

15  the objection period for any amended disclosure statement?

16          THE COURT:  Oh.

17          THE COURT CLERK:  And a further hearing.

18          THE COURT:  Thank you.  Thank you.  I had a

19  thought and I lost it about exactly that, so thank you.

20          You know, I want to ask all of you to focus on the

21  real issue here, and disclosure often becomes the

22  battleground if it's a layer to fight about, and, you know,

23  I'd like in some ways for people to forecast what their

24  confirmation issues will be, because it gives everybody time

25  to look at that and think about that.  But I don't want to

 1   have a lot of extensive disclosure fights.

 2           You all represent sophisticated clients, you all

 3   seem to be very experienced bankruptcy attorneys, and, you

 4   know, I just, I don't think our money is well spent on

 5   disclosure fights.  Confirmation fights, absolutely.  But I

 6   hope that you will be extremely judicious in what you put

 7   into a disclosure statement objection.  I will look very

 8   unfavorably towards, you know, just having more arrows shot

 9   at the Debtor that aren't really going to amount to much.

10           So it will delay the process, and you've all told

11   me that that's not in anybody's best interest.  So you all

12   have a common enemy, which is time, and we need to try to

13   manage this better.

14           So I will shorten the disclosure statement

15   objections to two weeks, so that'll get us teed up for the

16   confirmation fights much faster.  But even with the two

17   weeks, you know, choose your battles wisely, okay?

18           All right.  What else?

19           THE COURT CLERK:  Do you want to set a further

20   hearing date on the amended disclosure statement?

21           THE COURT:  Yeah, I guess while everybody is here

22   we could talk about that.

23           Anybody want to throw out some time period, and

24   then we'll check our calendar as the Court?  If we're having

25   these things all filed by the 26th, then two weeks from that

 1  for the disclosure objections would be -- I'm trying to get

 2  up my calendar.

 3           MS. RILEY:  Your Honor, this is Keri Riley for the

 4  Debtors.

 5           If objections to the disclosure statement would be

 6  due by the 11th, perhaps one week after, for the --

 7           THE COURT:  Hearing.

 8           MS. RILEY:  Yes.  So that would put us March 18th

 9  or March 19th, both of which are free on the Debtor's

10  calendars.

11           THE COURT:  Okay.

12           Anybody have a problem with the 18th, that you

13  know of?

14       (No audible response.)

15           THE COURT:  And, Kerstin, can you check for us to

16  see if we have a problem?

17       (Brief pause)

18           THE COURT CLERK:  Other than our regular relief

19  from stay docket, there shouldn't be a problem with the 18th.

20           THE COURT:  Okay.  We could start at 9:30 that

21  day.  Does anybody know, right now, that they are going to

22  participate in that hearing likely and they have a conflict?

23           MR. PADDOCK:  Your Honor, Robert Paddock for the

24  Strago group.  I don't know what our participation is going

25  to be at that hearing.  At least in Texas, that's our spring

1   break, and I'll be traveling that day.  So that's not a

2   reason to not set it for everyone else, I just don't know

3   whether we're going to have significant participation or not.

4          THE COURT:  Especially since your contract may be

5   rejected.  And so maybe an associate of your firm could fill

6   in for you, if needed.  Okay.

7          MR. PADDOCK:  Sure.

8          MR. GENO:  Your Honor, this is -- this is Craig

9   Geno.  I have some hearings that morning.  If we could set

10  this in the afternoon, that would allow me to participate on

11  the 18th.

12         THE COURT:  We could probably set it for 2:15.  I

13  always have a 1:30 preliminary relief from stay docket on

14  Thursdays, but we could do that.

15         MR. GENO:  That will work.  Thank you very much.

16         THE COURT:  Okay.  So the 18th at 2:15 Colorado

17  time.  Does anybody -- speak now or forever hold your peace.

18      (No audible response.)

19         THE COURT:  Okay.  That's our hearing time, and

20  we'll go from there.

21         Anything else before we recess?

22      (No audible response.)

23         MS. RILEY:  Nothing from the Debtors, Your Honor.

24  Thank you.

25         THE COURT:  Thank you.

1          Okay.  All right.  Then thank you, all.

2          And I'm wishing you all the best luck to find a

3   solution that everybody can live with here.  If it's less

4   than what the Code requires but you consent, I will not stand

5   in your way.  So, anyway.

6          Okay, we'll stand in recess.  Thank you.

7          UNIDENTIFIED MALE:  Thank you, Your Honor.

8          UNIDENTIFIED MALE:  Thank you, Your Honor.

9          THE COURT CLERK:  This Court is now in recess.

10             (Time Noted:  10:39 a.m.)

11                      *  *  *  *  *

12                      CERTIFICATE

13      I, RANDEL RAISON, certify that the foregoing is a

14   correct transcript from the official electronic sound

15   recording of the proceedings in the above-entitled matter, to

16   the best of my ability.

17

18

19   _____          February 23, 2021

20   Randel Raison

21

22

23

24

25